THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEONARD COULOMBE,

          Plaintiff,

    v.

TOTAL RENAL CARE HOLDINGS, INC.;
DAVITA INC.,

          Defendants.

NO. CV06-504 JLR

DEFENDANT'S CROSS MOTION FOR
SUMMARY JUDGMENT RE: LIABILITY
ON WASHINGTON WAGE STATUTE
CLAIM AND OPPOSITION TO
PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT

**<u>ORAL ARGUMENT REQUESTED
CLERK'S ACTION REQUIRED</u>**

**Defendant's Motion Noted for Motion
Calendar: October 20, 2006**

**Plaintiff's Motion Noted for Motion
Calendar: September 29, 2006**

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR)
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

**TABLE OF CONTENTS**

I.  INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 1

II. FACTS ................................................................................................ 5

    A.    DaVita's Award of Options to Coulombe and Other Employees ..................... 5

    B.    Coulombe's Voluntary Relinquishment of Stock ............................................. 7

    C.    DaVita's Performance after Relinquishment ................................................... 8

    D.    Coulombe's Layoff and Attempt to Exercise His Relinquished
        Options ............................................................................................................ 9

III. AUTHORITY AND ARGUMENT ......................................................................... 10

    A.    Coulombe's Claim Fails Because There Was No Unlawful Rebate ............... 10

        1.    Controlling Washington Law Holds that a Voluntary
            Employee Contribution Cannot Be a Violation of the Anti-
            Kickback Statute .................................................................................. 11

        2.    A Voluntary Relinquishment of Benefits Never Received is
            Not a Rebate ........................................................................................ 13

        3.    The Relinquishment of Worthless Options is Not a Rebate. .............. 15

    B.    Coulombe's Stock Options Are Not "Wages" ............................................... 16

        1.    Coulombe's Options Were Discretionary Compensation and
            Thus Do Not Qualify as "Wages" Under the Anti-Kickback
             Statute .................................................................................................. 16

        2.    Stock Options Are Not Generally Wages under Washington
            Law ...................................................................................................... 17

    C.    Plaintiff's Relinquishment Was An Authorized Rebate ............................... 19

    D.    Coulombe's Voluntary Relinquishment Was a Permissible
        Modification of the Terms of His At-Will Employment ............................... 20

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -i-
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

E. No Other Jurisdiction Has Sanctioned the Relief Coulombe Seeks ............... 22

F. Even if Options Are Wages, and a Rebate Occurred, Coulombe Still
Cannot Recover Under a Plain Reading of the Statute ................................. 22

IV. CONCLUSION ............................................................................................. 23

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -ii-
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant DaVita Inc. f/k/a Total Renal Care Holdings, Inc. ("DaVita") operates kidney dialysis centers across the United States. In the spring of 2000 DaVita's stock price fell to an all-time low of $2.56 per share. Like many other companies, DaVita allows its employees to share in the company's fortune by purchasing DaVita stock through the grant of stock options. Prior to the decline of DaVita's stock price in late 1999 and early 2000, DaVita had granted stock options to many of its employees, options priced at the much higher trading prices that had preceded the melt-down of DaVita's stock in early 2000. As a result, in early 2000, virtually every DaVita employee option share outstanding was, as they say, "underwater" and many were, in DaVita's phrasing, "way out of the money" or "WOOTM." Plaintiff Lenny Coulombe, for example, in 2000 had options for 60,833 shares priced at $18.75 and $32.29 per share.

At the same time, DaVita was facing significant challenges. In July 1999, it announced lower than expected earnings and determined that it needed to increase its reserves and accruals for operating expenses. Its Chief Operating Officer and Chief Financial Officer resigned. To help turn the Company around, DaVita hired Kent Thiry to be its Chief Executive Officer.

Given these challenges DaVita could ill afford to lose its key employees. Yet, DaVita knew that employees holding underwater stock options are far more likely to leave for other opportunities, and it was aware that companies facing similar circumstances had experienced mass employee defections and, in the worst cases, business collapse. In order to provide incentives for its employees to remain, in the spring of 2000, DaVita nearly exhausted its pool of available employee stock options by granting its employees new stock

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -1-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
(206) 583-8888

options at the now lower market prices. Coulombe greatly benefited from these new, lower-priced options, as he had been granted 20,000 shares on March 11, 1999 at a strike price of $9.0650, and had been granted an additional 20,000 option shared on March 29, 2000 at a strike price of $2.6875. Over the next few years he would exercise these options realizing stock profits of $664,934.

In order to replenish its employee option pool so as to continue to retain existing employees and attract new employees, DaVita asked its employees to consider relinquishing outstanding options priced higher than $15 per share, the so-called "Way Out of the Money" or WOOTM options. This program was entirely voluntary. Ultimately, DaVita employees collectively relinquished approximately 65% of the outstanding WOOTM options. Coulombe voluntarily relinquished 30,000 option shares, priced at $32.29 and 30,833 option shares priced at $18.75. Shortly thereafter, he was given the opportunity to revoke his relinquishment but he voluntarily decided not to. Instead, Coulombe waited until after he had left DaVita to file this lawsuit, claiming, among other things, that his voluntary relinquishment of his option shares violates Washington's Wage Rebate or Anti-Kickback statute.

The Washington Anti-Kickback Statute was enacted in 1939 and made it a crime to demand secret wage kickbacks. In this lawsuit, Coulombe asks the Court for an unprecedented ruling that the voluntary relinquishment of underwater stock option shares constitutes a criminal wage kickback *as a matter of law*. Coulombe is not entitled to summary judgment on this claim. Quite to the contrary, it is DaVita, not Coulombe, which, for multiple independent reasons, is entitled to summary judgment dismissing Coulombe's claim under the Anti-Kickback statute.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -2-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

First, controlling Washington law, not cited by Coulombe (but cited in the cases on which Coulombe relies), holds that even employee *cash* contributions cannot qualify as unlawful rebates under Washington law if the employee gives the money to his employer voluntarily. Because Coulombe admits under oath that he knowingly and voluntarily relinquished his underwater option shares, as a matter of controlling Washington law, the relinquishment cannot qualify as an unlawful wage rebate. Moreover, given the fact that, under Washington law, the voluntary forfeiture of earned and received wages is not a violation of the anti-kickback law, then the voluntary relinquishment of worthless and unexercised options cannot be a violation of the statute.

Coulombe's kickback claim fails for a second reason, as well. Under Washington law, discretionary compensation cannot qualify as "wages" under the Anti-Kickback statute unless the compensation is given so regularly as to transform into an implied contract. Because the option grants at issue here were, undisputedly, discretionary grants, the options cannot qualify as "wages." Moreover, these options cannot be considered wages because they are not subject to valuation. In addition, Coulombe's relinquishment does not qualify as a "rebate" under the Anti-Kickback statute because his option shares had never undergone the transactions necessary to turn them into something of value that could actually be the subject of a kickback.

Third, because Coulombe authorized the relinquishment, it was permissible under Washington's wage statutes because DaVita did not benefit financially from the transaction. Instead, the options simply went back into the pool of available options for grant to other employees.

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

Fourth, under well settled employment law principles, the relinquishment was a permissible prospective modification of the terms and conditions of Coulombe's employment.

Fifth, Coulombe's claim is unprecedented and finds no support from the law of other states with similar anti-kickback laws. At least twelve states currently have anti-kickback statutes, yet not a single court in any of these states has ever found an illegal rebate of wages involving the voluntary relinquishment of stock options by an at-will employee. The cases that Coulombe cites on this issue either have nothing to do with unlawful rebate statutes, involve facts different from Coulombe's, or turn on the presence of an employment contract.

Finally, Coulombe is not entitled to relief under RCW 49.52.070 because he knowingly participated in the alleged rebate. A plain reading of the statute bars Coulombe from recovering civil damages (and attorney's fees) for a violation of RCW 49.52.050 if he knowingly participated in the violation that is the basis of his complaint.

Coulombe, like many of his colleagues, voluntarily relinquished underwater stock options to help DaVita weather a business downturn in early 2000. Coulombe directly benefited from DaVita's subsequent resurgence, as his newer, lower-priced options—options that were only made possible by the voluntary relinquishment program—soared in value. Having reaped the benefits of DaVita's resurgence, he now asks the Court to undo the voluntary choice he made almost six years ago. This is not the role of Washington's Wage Rebate Statute.

DaVita respectfully requests this court deny Plaintiff's Motion for Partial Summary Judgment, and grant DaVita's Cross-Motion for Partial Summary Judgment on Coulombe's Wage Rebate claim.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -4-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

## II.  FACTS

**A.  DaVita's Award of Options to Coulombe and Other Employees**

DaVita is a leading operator of kidney dialysis centers nationwide. Declaration of Steve Udicious (Sept. 25, 2006) ("Udicious Decl.") at p. 1. In the early and middle part of the 1990's DaVita, like many other companies, experienced a wave of growth. Id. In October of 1995 the company's stock was trading at a then current price close to $20 per share,[1] and approximately one year later, its stock had doubled in price and was trading at close to $40 per share. Declaration of Aaron Westlund (Sept. 25, 2006) ("Westlund Decl.") at p. 2. The stock continued to hover between $30 and $47 per share until it hit its highest split-adjusted closing price in June 1998, at a little over $36 per share. Id.

In 1999 and early 2000, DaVita's stock price plummeted. Id. In the March of 2000, DaVita's stock hit its lowest trading point on record, a then current-price of $2.56 per share. Id. The company, and its employees, faced a crossroads. DaVita had seen years of steady growth, but now hundreds of DaVita employees were holding millions of outstanding stock option shares that were priced well above the trading price. Id. This had a significant impact on employee morale, as employees saw the value of their higher-priced stock options evaporate. Sanders Decl. at pp. 31-32 (Deposition of DaVita's 30(b)(6) Representative Steve Udicious (Sept. 14, 2006) ("DaVita Dep.") at 47:15-48:8); Udicious Decl. at p.1. Indeed, DaVita's leadership became concerned that the plummeting value of the employee

---

[1] In October 1997, the company experienced a five-for-three stock split, which reduced the trading price of the company's stock from $52 immediately before the split to about $32 immediately after the split. Westlund Decl. at 2. Throughout this brief, wherever relevant to a full and complete understanding of the facts, DaVita has noted when it is discussing split-adjusted shares or prices.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -5-
[38585-0002/SL062680.167]

**PERKINS COIE** LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

stock options could lead to an exodus of DaVita's most talented employees.  Udicious Decl. at p. 1.

DaVita was also experiencing operational difficulties and was losing money.  Id. at p. 2.  DaVita had replaced its senior management team, seeking to turn the Company around.  Id.  DaVita could ill afford to have its key employees leave, because that would make any attempt to turn the Company around difficult, if not impossible.  Id.  To encourage its employees to stay and ride out the difficult transition, DaVita decided to exhaust its pool of available option shares and grant its employees new option shares at the new lower prices.  Id.  As a result of this decision, Coulombe received an option to purchase 20,000 option shares of DaVita stock at a price of $2.6875 per share.  Westlund Decl. at p. 2.  DaVita's Board, however, knew it would need to replenish the employee option pool in order to continue to retain and attract the most talented employees.  Udicious Decl. at p. 2.

Thus, as a condition of allowing DaVita's management to issue the new, lower priced options in Spring 2000, DaVita's Board of Directors required management to ask DaVita's employees to return outstanding underwater option shares that were "way out of the money" and to seek shareholder approval for the issuance of additional option grants.  Id.  As a result DaVita embarked on two programs:  (1) a voluntary stock option relinquishment program for shares valued over $15; and (2) a proposal to DaVita's shareholders to issue an additional 2.75 million stock options to replenish the company's option pool.  Sanders Decl. at pp. 7-8 (Udicious Dep. At 24:17-25:19).  While the two programs were separate, DaVita's WOOTM program helped the company obtain shareholder approval for the issuance of new option shares for the reasons discussed below.  Sanders Decl. at pp. 11-12 (Udicious Dep. At 70:19-71:12).

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -6-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
(206) 583-8888

## B. Coulombe's Voluntary Relinquishment of Stock

In November 2000, Coulombe and hundreds of other DaVita option holders were given the *choice* of relinquishing their underwater stock options with exercise prices over $15 per share. Udicious Decl. at p. 2. DaVita's stock, at that time, was trading between $10 and $11 per share, and the last time the stock had traded above the $15 mark had been in July of 1999 (later that same month the stock dropped to $8.38 per share). Westlund Decl. at 2. Employees who decided to voluntarily relinquish their underwater WOOTM option shares had to do so in writing. Sanders Decl. at pp. 9-10, 13, 26 (Udicious Dep. at 27:15-28:9 & Ex. 5) & (Coulombe Dep. at Ex. 10).

Coulombe confirmed in his deposition that employee relinquishment was entirely voluntary. Sanders Decl. at pp. 24 (Coulombe Dep. at 88:4-88:12). Ultimately, Coulombe, by letter dated November 22, 2000, chose to voluntarily relinquish 60,833 option shares with exercise prices of $18.75 and $32.19. Sanders Decl. at pp. 13, 26 (Udicious Dep. at Ex. 5) & (Coulombe Dep. at Ex. 10). Coulombe did so because he felt it was in his best interest. In particular, he hoped that by relinquishing these options, the Company would consider granting him new options in the future, which would be of greater value than the WOOTM options. Sanders Decl. pp. 22-23 (Coulombe Dep. at 88:13-88:25). He also confirmed that he was given the opportunity to revoke his relinquishment and keep the WOOTM options. Sanders Decl. at pp. 19-20 (Coulombe Dep. at 86:23-87:9). He decided not to revoke his relinquishment because these options were not close to being in the money. Id. (Coulombe Dep. at 82:18-83:24). He was aware of at least one other employee who revoked her relinquishment. Id.

The relinquished option shares had been granted to Coulombe in August 1996, April 1997, and February 1998 pursuant to DaVita's 1994, 1995, and 1997 Equity Compensation

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

Plans. Westlund Decl. at p. 2. The stated purpose of the 1994 plan was "to promote the interest of [DaVita Inc.] . . . and its stockholders by (i) attracting and retaining key employees, directors, and consultants and advisers of the Company and its Affiliates; (ii) motivating such individuals by means of performance-related incentives to achieve longer-range performance goals; and (iii) enabling such individuals to participate in the long-term growth and financial success of the Company." The stated purpose of the 1995 and 1997 plans was to "attract, retain, and reward employees, directors, and other persons providing services to the Company and, accordingly, to strengthen the mutuality of interests between Participants and the Company's stockholders by providing Participants with a proprietary interest in pursuing the Company's long-term growth and financial success." Id. at pp. 5-35 (Exs. A, B & C). Both the April 1997 and February 1998 grants, like almost all grants of stock options by DaVita, were entirely discretionary. Udicious Decl. at p. 3.

Overall about 100 people, or approximately one-third of DaVita's option holders, chose *not* to participate in the voluntary relinquishment program. Udicious Decl. at p. 2. As of February 27, 2001, about 65% of the outstanding WOOTM shares, 937,204 shares, had been returned; 35% of the shares were not returned and were, instead, retained by employees. Sanders Decl. at pp. 14-15 (Udicious Dep. at Ex. 10). No one who chose to keep their WOOTM shares suffered any adverse action as a result. Udicious Decl. at p. 2. Indeed, Coulombe's peer, Cheryl MacDougall, chose to retain more than 20,000 WOOTM shares and she remains with DaVita today. Sanders Decl. at p. 21 (Coulombe Dep. at 85:12-13).

## C.    DaVita's Performance after Relinquishment

Following DaVita's successful stock relinquishment program, the Company also engaged in an effort to obtain shareholder approval for the issuance of an additional 2.75

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -8-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

million option shares. Sanders Decl. at pp. 33-35 (Deposition of DaVita's 30(b)(6) Representative Steve Udicious (Sept. 14, 2006) ("DaVita Dep.") at 95:19-97:25. The company's proposal was vetted through Institutional Shareholder Service, ISS. Udicious Decl. at p. 3. ISS approval is deemed essential in order to obtain shareholder approval. Id. ISS, however, basis its approval, in part, on the number of outstanding and available option shares, and their expiration periods. Id.

Because of the number of options relinquished as part of the November WOOTM, ISS approved a recommendation to DaVita's shareholders to issue an addition 2.75 million option shares. Id. This proposal replenished DaVita's available pool of options and enabled it to attract executive talent. Id. Today DaVita's stock is trading upwards of $57 per share. Westlund Decl. at 2.

**D.    Coulombe's Layoff and Attempt to Exercise His Relinquished Options**

In the five years following relinquishment of his underwater options Coulombe exercised 40,000 option shares for a net profit of $664.934. Westlund Decl. at p. 3. In November 2005 Coulombe, and the six other individuals who comprised his group, were laid off after DaVita's then director of compliance, Jung Lee, determined that the functions of Coulombe's department were no longer needed. Declaration of Jung Lee (Sept. 25, 2006) ("Lee Decl.") at p. 2. By that time, Coulombe had exercised all of his remaining option shares. Westlund Decl. at p. 3.

Following his layoff, Coulombe sent a letter to DaVita requesting exercise of the 60,833 stock options he had voluntarily relinquished five years earlier. Udicious Decl. at p. 3-4 (Ex. C). When DaVita did not honor his request Coulombe brought suit in King County Superior Court against DaVita alleging several common law theories of recovery including

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -9-
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

breach of contract, and asserting various violations of Washington's Wage statutes. This matter was removed to federal court based on diversity jurisdiction.

## III.  AUTHORITY AND ARGUMENT

### A.  Coulombe's Claim Fails Because There Was No Unlawful Rebate

Washington's Wage Rebate Statute was originally enacted in 1939 as an "Anti-Kickback" statute, whose intent was "to prevent abuses by employers in a labor-management setting, e.g., coercing rebates from employees in order to circumvent collective bargaining agreements." Ellerman v. Centerpoint Prepress, Inc., 143 Wn.2d 514, 519-20, 22 P.2d 795 (2001) (*en banc*).  The Statute makes it a *criminal offense* for:

> Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, [to]
>
> . . . collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee.

RCW 49.52.050.  RCW 49.52.070, in turn, provides for civil penalties for a violation of Washington's Wage Rebate Statute, including "judgment for twice the amount of the wages unlawfully rebated . . . by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees."  Id.

The "fundamental purpose of the legislation, as expressed in both the title and body of the act, is to protect the *wages* of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of any part of such wages." Ellerman, 143 Wn.2d at 520 (quoting Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 961 P.2d 371 (1998)) (emphasis in original).  Here, Coulombe's claim does not fit within the parameters of the Rebate Statute.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -10-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington  98101-3099
(206) 583-8888

**1.     Controlling Washington Law Holds that a Voluntary Employee
         Contribution Cannot Be a Violation of the Anti-Kickback Statute**

Coulombe's Wage Rebate claim fails as a matter of law because it is undisputed that

he freely and voluntarily chose to relinquish his underwater shares. Coulombe argues

vigorously and repeatedly that whether he voluntarily relinquished his stock options is

"immaterial" to his claims. Plaintiff Motion for Partial Summary Judgment ("Pl. Mem.") at

6. Coulombe's argument is directly contrary to controlling Washington law. The

Washington Supreme Court held in State v. Carter that an employee may *voluntarily* do with

their wage whatever they will, including donating a portion of that wage to their employer

(public or private) if they so chose. 18 Wn.2d 590, 622-24, 142 P.2d 403 (1943) (*en banc*).

A voluntary contribution, even of cash, does not, as a matter of law, violate the Washington

anti-kickback statute.

In Carter, a group of employees had voluntarily decided to each donate 10% of their

wages to their boss, the county treasurer, until they had collected enough to help him pay off

a debt he had incurred before taking office. Id. at 616. The employees' stated reason was

that Carter had taken good care of them when he took over the treasurer position, preserving

their jobs and increasing their salaries. Id. The court noted that "[w]hile occasion for the

manifestation of such generosity on the part of the employee may not be frequent . . . *there

is nothing in the [Wage Rebate Statute] which proscribes such efforts*." Id. at 622 (emphasis

added).

Indeed, the court noted that once an employee receives their wage, they may do with

it as they will. Id. 622-23.

> If the contribution be in fact a *voluntary donation*, it does not necessarily
> constitute a rebate of wages merely because it moves to, or for the benefit of,
> the employer.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -11-
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

Id. at 623 (emphasis added). The dispositive question is "whether the act has been voluntary or involuntary, that is, whether the transaction in reality is a donation or whether it has assumed that aspect merely to cloak a form of compulsion." Id.

Here, Coulombe candidly admits he relinquished his underwater WOOTM option shares freely and voluntarily and with no hint of coercion. Sanders Decl. at p. 24 (Coulombe Dep. at 88:4-12).

Nor can Coulombe ascribe sinister motives to DaVita. The only reason DaVita asked its employees to turn back their WOOTM shares is because the company had nearly exhausted its option pool in an earlier effort to take care of its employees by issuing new options at the lower strike price. Later, when the company asked the employees to consider giving up their underwater options, many employees did. But no one had to, and many employees did not. Others later chose to revoke their relinquishment. DaVita's employees were asked to relinquish options for the good of DaVita, and its future prosperity. And, in fact, as a result of replenishing the option pool, DaVita was able to continue to retain and attract excellent employees and it has since prospered, to everyone's benefit, including Coulombe's. And while DaVita was appreciative of the team spirit exhibited by those who turned in their underwater WOOTM options, no one who declined to participate – or who revoked their relinquishment – was punished for their decision.

Plaintiff's failure to mention Carter—controlling authority that directly contradicts his repeated argument that the question of free choice is irrelevant—is inexcusable inasmuch as Coulombe's own authority cites Carter for its central holding. Coulombe relies primarily on McDonald v. Wockner, 44 Wn.2d 261, 267 P.2d 97 (1954), to support the proposition that "even if Plaintiff Coulombe 'voluntarily' relinquished his stock options, the Wage statute was violated . . . ." Plf. PSJ at 8. As an initial matter, Wockner expressly states that it does

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -12-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

*not* stand for that proposition: "There is no contention in this case that any voluntary contributions were given by respondent to appellant because appellant denied that any sum whatever had been rebated." Id. at 269. Moreover, and fatal to Coulombe's claim, the Wockner opinion cites and discusses the holding in Carter:

> [The Wage Rebate Statute], originally passed by the legislature in 1939, has been construed in but one case, State v. Carter, 18 Wash.2d 590, 140 P.2d 298, 142 P.2d 403. In that case this court construed the statute as to public officers and held that the act did not prohibit *voluntary contributions* by an employee to his employer or in his employer's behalf, which were made after the employee had received the wage or salary due him.

Mcdonald v. Wockner, 44 Wn.2d 261, 269, 267 P.2d 97 (1954) (emphasis added).

**2. A Voluntary Relinquishment of Benefits Never Received is Not a Rebate.**

At the time Coulombe relinquished his options, he had never exercised them and had not received cash for them. Nor would he given that they were "under water" and of no value. Under Washington law, a relinquishment of a benefit never received is not a rebate. The case of Logan v. Acordia Northwest, Inc., No. 4957-7-I, 2002 WL 31160337, at *1 (Wash. Ct. App. 2002) (unpublished), is analogous.[2] There, the employee elected to defer a portion of his *earned* salary into a deferred compensation plan that provided for forfeiture if he were to quit his job before his account vested. Id. The deferred compensation was used to purchase Acordia stock. Id. Logan eventually left Acordia and forfeited his deferred

---

[2] This court may consider an unpublished Washington State Court of Appeals decision as persuasive authority. See, e.g., Renick v. Bradstreet Receivable Mgmt. Servs., 290 F.3d 1055, 1058 (9th Cir. 2002) ("Ninth Circuit Rule 36-3 quite clearly prohibits citations only of our unpublished dispositions; it does not apply to unpublished dispositions issued by any other courts within our circuit or elsewhere."); Herring v. Teradyne, Inc., 256 F. Supp. 2d 1118, 1128 n.2 (S.D. Cal. 2002) (noting that courts have narrowly construed Ninth Circuit Rule 36-3 to prohibit citation of unpublished authority from the Ninth Circuit Court of Appeals only).

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -13-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

compensation. Id. Logan argued that this forfeiture provision violated the Washington

Anti-Kickback Statute. Id. at *2. The court disagreed. Id. at *2-3. The court noted that for

an employer to collect or receive a rebate, it must first pay the money to the employee and

then ask for it to be returned. Id. at *2. The court found it dispositive that Logan:

> ". . .did not receive the *money* and then return it. Instead he directed Acordia *in writing* to withhold a certain portion of his salary. There was no 'rebate.'"

Id. Similarly, DaVita did not collect or receive a rebate because it had not paid Coulombe

for the value of the options nor did it ask him to return any cash that he had received from

the exercise of options. In fact, at the time Coulombe relinquished his options, they were

worthless.

Coulombe's argument is that any relinquishment or forfeiture of options, even those

that are worthless, is unlawful. That argument, if adopted by the Court, would threaten to

invalidate stock option programs, tender back programs approved by the Securities and

Exchange Commission, and any federally-approved plan that allows for the deferral of

compensation, which is subject to forfeiture. As the Logan court found, "[a]ccepting

Logan's construction of RCW 49.52.050 would invalidate any deferred compensation plan

for the purchase of stock if the plan includes a forfeiture provision. . . . We decline to

interpret RCW 49.52.050 in a manner which might well invalidate many existing deferred

compensation plans in this state." Id. Coulombe's argument is also inconsistent with the

Ninth Circuit's decision in IBM v. Bajorek, 191 F.3d 1033, 1039 (9th Cir. 1999), which held

that receipt back by company of close to one million dollars in profits from exercise of stock

options by former employee, pursuant to forfeiture provision in stock option agreements,

was not an illegal rebate in violation of California's anti-kickback statute because employee's

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -14-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

stock options were not wages.[3] Thus, Coulombe's far-reaching (and over-reaching) argument should be rejected.

### 3. The Relinquishment of Worthless Options is Not a Rebate.

At the time that Coulombe relinquished his option shares, they were underwater, and lacked any monetary value. In November 2000, when Coulombe relinquished his underwater options, DaVita's stock was trading at a $10.56. Plaintiff's WOOTM option shares had exercise prices of $18.75 and $32.19. Under the terms of his option agreements, had he chosen to exercise, Coulombe would have been required to pay DaVita the full exercise price of his option shares – $578,118.75 (for 30,833 shares at an exercise price of $18.75) plus $482, 850 (for 15,000 shares at an exercise price of $32.19), totaling 1,060,968.75 – in order to receive $483,996.48. Plaintiff, then, would have *lost* $576,972.27 by exercising his vested options in November 2000.

The purpose of Washington's Wage Rebate statute is to prevent employees from rebating something of monetary value to their employer. The statute itself speaks of wages "theretofore paid" to the employee, and the damages permitted under RCW 49.52.070 are calculated by doubling the amount that was rebated or underpaid. RCW 49.52.050 & .070. Because Coulombe's WOOTM options had no positive monetary value at the time he

---

[3] Under California Labor Code § 221, like RCW 49.52.050, it is unlawful "for any employer to collect or receive from employee any part of wages theretofore paid by said employer to said employee." California's labor code defines wages to include "all *amounts* for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Bajorek, 191 F.3d at 1039 (citing Cal. Lab. Code § 200). Under this very broad definition of wages, the Ninth Circuit in Bajorek concluded that "[s]tock options are not amounts. They are not money at all. They are contractual rights to buy shares of stock." Id.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -15-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

relinquished them, the transaction cannot qualify as a rebate under the Anti-Kickback statute.

## B.   Coulombe's Stock Options Are Not "Wages"

### 1.   Coulombe's Options Were Discretionary Compensation and Thus Do Not Qualify as "Wages" Under the Anti-Kickback Statute

Coulombe's stock options were an entirely discretionary form of compensation, not subject to the Washington Wage Rebate Statute.  In Byrne v. Courtesy Ford, Inc. the Washington Court of Appeals examined whether a TV won by a car salesman, while on company business, was a wage for purposes of RCW 49.52 *et seq.*  Byrne v. Courtesy Ford, Inc., 108 Wn. App. 683, 689, 32 P.3d 307 (2001).  The employee contended that he was discharged in retaliation for not giving the TV to his boss, and cited Washington's Anti-Kickback Statute as clear public policy supporting his claim.  Id. at 689-91.  The court ultimately held that a TV was not a "wage," not because it was a TV instead of cash, but because the TV was given as a discretionary bonus.  Id.  The court affirmed well settled Washington law that "a discretionary bonus, unless given consistently and repeatedly *is a mere gratuity, not compensation.*"  Id. (emphasis added).  Indeed, a discretionary bonus must be given so regularly that it gives rise to "an *implied contract* and reliance, otherwise, it is *a mere gratuity.*"  Id. at 691 (emphasis added).

The same reasoning is applicable here.  Plaintiff can offer no evidence from the record that he received stock options so frequently as to give rise to an implied contract.  Indeed, nearly all stock options grants, including those granted Coulombe in 1997 and 1998, are an entirely discretionary form of compensation at DaVita, to which Coulombe had *no entitlement*, and which he did not receive regularly during his employment.  Udicious Decl. at 3.  In fact, he received no stock options for the years 2001 through 2005.  As such,

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -16-
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

Coulombe's stock options, although compensation, were not "wages" and thus are not subject to the Wage Rebate Statute.

## 2. Stock Options Are Not Generally Wages under Washington Law

Even if Coulombe's stock options had not been wholly discretionary, they would not count as "wages" under the anti-kickback statute. The Washington Anti-Kickback Statute does not expressly define the term "wages." But it is clear from both the language of the statute, and its underlying purpose, that it contemplates something apart from stock options. As mentioned above, the statute speaks of "wages theretofore paid" and damages that are twice the "amount" of the alleged rebate. These terms suggest the mathematical precision associated with monetary wages. Cf. IBM, 191 F.3d at 1039. As Bajorek court noted, stock options have no independent monetary value to the employee apart from their value in relation to the performance of a particular stock. Id. As such, their value fluctuates from moment to moment. Id. It may be positive, zero, or negative, depending on the underlying stock value. Indeed, the difficulty of treating options as wages is presented by Coulombe's claim. Specifically, one question presented is at what time do you value the options? Is it when Coulombe relinquished it? If so, Coulombe's claim – like the value of his options – is worthless. Are they valued at the time he decided not to revoke his relinquishment, at the time he normally exercised options, at the time he was laid off, or at the time he claimed to exercise the options? Given these difficulties, it is no wonder the Ninth Circuit has already held that options are not wages. See IBM, 191 F.3d at 1039.

In addition, options are not legal tender; they are contracts to purchase individual shares of stock at a future date, for a specific price. Before employees will see any monetary benefit from stock options, they must first exercise those options to purchase shares of stock, and then sell those shares of stock (at a time when the exercise price is lower then the share

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -17-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

price) to benefit from any profit between the exercise price and the stock price. Stock options, thus, are at least two steps removed from being cash. Indeed, an employee could purchase shares of stock and then wait months, or even years, before they sell that stock—even waiting to sell the stock after leaving employment with the company whose shares they purchased. What DaVita has given Coulombe, then, is the contractual right to purchase shares of stock in the future, not wages.

The cases Coulombe cites are readily distinguishable. In <u>Bates v. City of Richland</u>, 112 Wn. App. 919, 939, 51 P.3d 816 (2002), for example, the court applied the definition of RCW 49.46.010(2) in ruling that pension benefits qualify as "wages" under Washington's attorney fee shifting statute, RCW 49.48.030. However, RCW 49.46.010(2) provides that compensation must be "payable in legal tender" in order to qualify as "wages," a requirement that employee stock option grants plainly do not satisfy. In <u>Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett</u>, 146 Wn.2d 29, 35, 42 P.3d 1265 (2002), the "wage" at issue was the quintessential "wage," monetary backpay. In <u>Flowers v. TRA Indus., Inc.</u>, 127 Wn. App. 13, 35, 111 P.3d 1192 (2005), the court described "wages" under RCW 49.48.030 as "*moneys* due by reason of employment." Coulombe's reliance on a Washington family law case is likewise misplaced. In <u>re Marriage of Ayyad</u>, 110 Wn. App. 462, 468, 38 P.3d 1033 (2002), involved the question of whether *cash profits* from the exercise of stock options qualified as "income" for purposes of determining child support payments. Here, there are simply no cash profits at issue (even if the definition of "income" in the family law arena were otherwise somehow pertinent to the definition of "wages" under the anti-kickback statute).

Finally, Coulombe relies on two cases from other jurisdictions. Both the <u>Scully</u> and <u>Montemayor</u> cases, however, involved high ranking corporate officers who received stock

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -18-
[38585-0002/SL062680.167]

**PERKINS COIE LLP**
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

options as a part of their fixed term *employment contracts* that also contained "just cause" termination provisions. Compare Montemayor v. Jacor Comm., Inc., 64 P.3d 916, 923-24 (2003) (considering whether stock options are wages in context of fixed term employment contract); Scully v. US WATS, Inc., 238 F.3d 497, 517-18 (2001) (holding stock options to be wages where plaintiff was granted stock options that vested over the two year term of his employment agreement, is exchange for his direct efforts as CEO to boost the company's stock price *during that same period.*); with Oracle Corporation v. Falotti, 187 F.Supp.2d 1184, 1201-02 (N.D. Cal. 2001) (finding stock options were not wages and distinguishing Scully on the grounds that stock options were only wages in that context because of the presence of a fixed term employment agreement); Law v. Terayon Communications Systems, Inc., No. H023523, 2003 WL 21399948, at *3 (Cal. App. 2003) (holding that stock options were not wages and distinguishing Scully because in that case "[t]he employer had wrongfully terminated the employee in violation of [an employment] contract; accordingly the contractual provision for stock options was deemed part of this recovery for lost compensation.) Plaintiff's reliance on Scully and Montemayor is misplaced because neither is applicable here due to the fact that Coulombe was an at-will employee.

## C.    Plaintiff's Relinquishment Was An Authorized Rebate

Even if discretionary stock option grants did qualify as "wages" and even if an employee's free choice was not a disqualifying factor, and even if the forfeiture of underwater options did somehow qualify as a "rebate," Coulombe's claim must fail because he authorized the relinquishment in writing. An employer is permitted to make deductions from an employee's wages:

> The provisions of RCW 49.52.050 shall not make it unlawful for an employer
> to withhold or divert any portion of an employee's wages . . . when a
> deduction has been expressly authorized in writing in advance by the

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -19-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

employee for a lawful purpose accruing to the benefit of such employee . . . PROVIDED, That the employer derives no financial benefit from such deduction and the same is openly, clearly and in due course recorded in the employer's books.

RCW 49.52.060. Under the statute, Coulombe's voluntary relinquishment of his stock options was an authorized withholding. Coulombe, in November 2000, signed and delivered a letter to DaVita, authorizing DaVita to take back his underwater stock options. It was only after receipt of that letter that DaVita then received back Coulombe's options.

Coulombe benefited from the relinquishment program because the resulting replenishment of DaVita's employee option pool helped DaVita retain and attract employees, making its dramatic resurgence possible, which was recognized in the stock market by a dramatic increase in the price of DaVita's stock. Because of this, Coulombe was able to exercise his remaining stock options for a personal profit of more than $350,000. Conversely, while the relinquishments helped fuel DaVita's eventual resurgence, DaVita derived no immediate *financial* benefit from the relinquishment of the underwater shares. Rather, those shares went back into the employee option pool.

**D.     Coulombe's Voluntary Relinquishment Was a Permissible Modification of the Terms of His At-Will Employment**

It is well settled that an employer may, under general principles governing at-will employment, prospectively modify the terms of an employee's compensation so long as the employee receives notice of the change. See, e.g., Martin v. Golden Corral Corp., 601 So. 2d 1316, 1317 (Fla. App. 1992) (" . . . there is authority from other jurisdictions that the employer also can modify the original compensation agreement. . . . Basic contract principles govern modifications to employment at-will contracts."); Albrant v. Sterling Furniture Co., 736 P.2d 201, 203 (Or. Ct. App. 1987) ("an employer may also modify the

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -20-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

employment contract so long as the modification applies only prospectively. An employee impliedly accepts such modifications by continuing employment after the modification."). The consideration necessary to modify the at-will employment relationship is provided by the employee's decision to continue their employment. Albrant, 736 P.2d at 203.

Indeed, in Cochran v. Quest Software, Inc., the First Circuit considered the claims of a former employee who sued his former employer, claiming breach of contract, in part, because some of his stock options were partially rescinded by the company, prior to his termination. 328 F.3d 1, 4-6 (1st Cir. 2003). The court noted that the actions taken by the company amounted to a "partial rescission of the options [as] a valid consensual modification of the employment arrangement." Id.

> After the partial rescission, the [company] forbore from ending the employment relationship and the plaintiff continued to work for the [company] for more than three months. We think that this constituted mutual consideration. Where, as here, the parties reach an agreement to modify the terms of an at-will employment contract, the employer's forbearance from ending the employment relationship, coupled with the employee's continued performance, can satisfy the consideration requirement.

Id. It is likely that a Washington Court would reach a similar result, permitting an employer to modify the prospective terms and conditions of employment, including the employee's compensation. See Cummings v. Edgate.com, Inc., No. 30423-6-II, 2004 WL 792185, *3 (Apr. 14, 2004) (where employment letter provided for "target" annual compensation and specified that employment would be "at will" court found that "Edgate was free to modify Cummings' salary at will.").

Similarly, here, DaVita's actions with respect to Coulombe's stock options amount to nothing more than a consensual modification of Coulombe's compensation package going forward. Indeed, as Coulombe's opening brief points out, DaVita regularly takes into

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -21-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

account the full range of an employee's compensation when deciding the terms of future compensation. Here, DaVita granted Coulombe 20,000 shares worth of options at a lower exercise price, prior to asking him to relinquish his underwater options. The subsequent relinquishment, then, was merely a modification of Coulombe's overall compensation going forward. A modification that Coulombe accepted, without complaint, for more five years (more than four years longer than the unsuccessful plaintiff in Cochran).

## E.   No Other Jurisdiction Has Sanctioned the Relief Coulombe Seeks

Apart from all the other reasons Coulombe's claim must fail, it bears repeating that no court in any jurisdiction has ever found that relinquishment of an employee stock option constitutes an unlawful kickback. Washington is not the only state with an anti-kickback statute. Indeed, at least twelve other states, including Alaska, California, Colorado, Connecticut, Illinois, Michigan, Minnesota, Nevada, New York, Pennsylvania, Utah, and Vermont, have statutes specifically for the prevention of illegal kick-backs. See 4 Empl. Coordinator (RIA), ch. 32 (West 2006) (cataloging state statutes). No decision from any of these jurisdictions has held that the voluntary relinquishment of stock options constitutes an illegal rebate of wages.

## F.   Even if Options Are Wages, and a Rebate Occurred, Coulombe Still Cannot Recover Under a Plain Reading of the Statute

RCW 49.52.050 makes the rebate of an employee's wage a misdemeanor. A private right of enforcement for damages is found in RCW 49.52.070 which allows for a suit for double damages and attorneys fees for a breach of RCW 49.52.050. "[T]he benefits of . . . [RCW 49.52.070 are] not . . . available to any employee who has knowingly submitted to" a violation of Washington's Wage Rebate Statute.

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -22-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

Here, Coulombe is not entitled to civil enforcement because he knowingly and freely participated in the alleged rebate that forms the basis of his claim. Plaintiff knowingly and voluntarily relinquished his stock options to DaVita in November 2000. He was given the opportunity to rescind that relinquishment and did not do so. He then waited five years to complain about the alleged rebate without making any other complaints in between. As such, his knowing and voluntary participation in the relinquishment of his options prevents him from enforcing a claim for double damages and attorneys fees now.

## IV.     CONCLUSION

For the foregoing reasons, this Court should deny Plaintiff's Motion for Partial Summary Judgment, and grant DaVita's Motion for Partial Summary Judgment regarding Coulombe's claims under the Washington Wage Rebate Statute.

DATED:  September 25, 2006.

s/ James Sanders
James Sanders, WSBA 24565
Brian M. Flock, WSBA #36919
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone:  206-359-8000
Fax:  206-359-9000
E-mail:  JSanders@perkinscoie.com

Attorneys for Defendants

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -23-
[38585-0002/SL062680.167]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

# CERTIFICATE OF SERVICE

On July 12, 2006, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of

**Defendant's Cross Motion For Summary Judgment Re: Liability On Washington Wage Statute Claim And Defendant's Opposition To Plaintiff's Motion For Partial Summary Judgment**

David E. Breskin         \_\_    Via hand delivery
Claudia Kilbreath          \_\_    Via U.S. Mail, 1st Class,
Short, Cressman & Burgess, PLLC      Postage Prepaid
999 Third Avenue, Suite 3000      \_\_    Via Overnight Delivery
Seattle, Washington 98104-4088      \_\_    Via Facsimile
                                       **X**    Via Efiling

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED at Seattle, Washington, this _____ day of _____, 2006.

s/ James Sanders
James Sanders, WSBA 24565
Brian M. Flock, WSBA #36919
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: 206-359-8000
Fax: 206-359-9000
E-mail: JSanders@perkinscoie.com

DEFENDANT'S OPPOSITION TO
PLAINTIFF'S MOTION & DEFENDANT'S
CROSS MOTION (CV06-504 JLR) -24-
[38585-0002/SL062680.167]