UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LENNY COULOMBE,<br><br>Plaintiff,<br><br>v.<br><br>TOTAL RENAL CARE HOLDINGS, INC.,<br>DAVITA, INC.,<br><br>Defendants. | No. CV6-504 JLR<br><br>DECLARATION OF JAMES SANDERS IN SUPPORT OF DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT RE: LIABILITY ON WASHINGTON WAGE STATUTE CLAIM AND DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |

JAMES SANDERS states and declares as follows:

1.      I am one of the lawyers representing defendant DaVita Inc. ("DaVita") in this litigation. I am over the age of 18, competent to testify, and make this declaration based upon my personal knowledge and the files and records in this matter.

2.      Attached as Exhibit "A" are true and correct copies of excerpts of the deposition of Steve Udicious taken on August 8, 2006, including certain exhibits attached thereto.

DECLARATION OF JAMES SANDERS - 1
(NO. CV6-504 JLR)
[38585-0002/SL062650.149]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

3.    Attached as Exhibit "B" are true and correct copies of excerpts of the deposition of plaintiff Leonard Coulombe taken on August 25, 2006, including certain exhibits attached thereto.

4.    Attached as Exhibit "C" are true and correct copies of excerpts of the deposition of DaVita's 30(b)(6) representative, Steve Udicious, taken on September 14, 2006.

Signed this 25th day of September 2006, at Seattle, Washington.

_____/s/ James Sanders_____
JAMES SANDERS

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

# CERTIFICATE OF SERVICE

On September 25, 2006, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the foregoing document.

| David E. Breskin | | |
|---|---|---|
| Short Cressman Burgess PLLC | ___ | Via hand delivery |
| 999 Third Avenue, Suite 3000 | ___ | Via U.S. Mail, 1st Class, Postage Prepaid |
| Seattle, WA 98104-4088 | ___ | Via Overnight Delivery |
| Attorneys for Plaintiff | ___ | Via Facsimile |
| | **X** | Via E-filing |

I certify under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED at Seattle, Washington, on September 25, 2006.

s/James Sanders, WSBA #24565
State Bar Number: 36919
James Sanders, WSBA #24565
Brian M. Flock, WSBA #36919
Attorneys for Defendant
**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Telephone: (206) 359-8000
Fax: (206) 359-9000
E-mail: JSanders@perkinscoie.com

DECLARATION OF JAMES SANDERS - 3
(NO. CV6-504 JLR)
[38585-0002/SL062650.149]

PERKINS COIE LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8888

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

   —  —  —

| | | |
|---|---|---|
| LEONARD COULOMBE | : | NO CV06-504 |
| | : | |
| v. | : | |
| | : | |
| TOTAL RENAL CARE | : | |
| HOLDINGS, INC. | : | |
| DAVITA INC. | : | |

   —  —  —

AUGUST 8, 2006

   —  —  —

Telephonic oral deposition of

STEVE J. UDICIOUS, taken pursuant to

notice, was held at the law offices of

AKIN, GUMP, STRAUSS, HAUER & FELD, LLP,

One Commerce Square, 2005 Market Street,

Suite 2200, Philadelphia, PA beginning at

1:45 p.m., on the above date, before

Nancy D. Ronayne, a Professional Court

Reporter and Notary Public in the

Commonwealth of Pennsylvania.

   —  —  —

ESQUIRE DEPOSITION SERVICES
Four Penn Center
1600 John F. Kennedy Boulevard-12th Floor
Philadelphia, Pennsylvania 19103
(215) 988-9191

**Declaration of
J. Sanders -4**              **Exhibit A**

1   APPEARANCES:

2

3         SHORT CRESSMAN & BURGESS, PLLC
          BY:  DAVID E. BRESKIN, ESQUIRE
4         999 Third Avenue
          Suite 3000
5         Seattle, WA 98104-4088
          (206) 682-3333
6         (Via telephone)
          Representing the Plaintiff
7

8

          PERKINS COIE, LLP
9         BY:  JAMES SANDERS, ESQUIRE
                   and
10            BRIAN M. FLOCK, ESQUIRE
          1201 Third Avenue
11        Suite 4800
          Seattle, WA 98101-3099
12        (206) 359-9000
          (Via telephone)
13        Representing the Defendant

14

15              -   -   -

16

17

18

19

20

21

22

23

24   **Declaration of
     J. Sanders -5**

1

2                          - - -

3               STEVEN J. UDICIOUS, after

4          having been duly sworn, was

5          examined and testified as follows:

6                          - - -

7               DIRECT EXAMINATION

8                          - - -

9     BY MR. BRESKIN:

10          Q.     Mr. Udicious, can you hear

11    me, okay?

12          A.     Yes.

13          Q.     Great.  Would you state your

14    full name and address for the record.

15          A.     Name is Steven with a V,

16    Udicious, U-D-I-C-I-O-U-S.  Address, 1300

17    Wendover, W-E-N-D-O-V-E-R, Road,

18    Rosemont, PA 19010.

19          Q.     Have you had your deposition

20    taken before?

21          A.     I have.

22          Q.     When was the last time?

23          A.     The last time was probably

24    -- probably two or three years ago.

1  was available there.  It's not as if you
2  could tie specific options that were
3  either voluntarily relinquished or
4  expired by their terms, you couldn't tie
5  those shares to any specific future
6  grant.
7          Q.    Is it correct that the
8  company decided to seek return from
9  employees of existing stock options in
10  2000 rather than seeking amendments to
11  the option plans to increase the number
12  of options that could be issued?
13          MR. SANDERS:  I'm sorry,
14      could you restate?  That question
15      seemed vague to me also.
16  BY MR. BRESKIN:
17          Q.    Mr. Udicious, you told me
18  that there were two plans under
19  consideration in 2001, one was to seek
20  return from employees of existing stock
21  options, and a second plan or proposal
22  was to seek amendment of stock option
23  plans to increase the number of options
24  that could be issued; is that correct?

1    A.    That's correct.

2    Q.    And did the company choose

3    one of these ways to go?

4    A.    They -- they pursued both.

5    The relinquishments were pursued in the

6    second half of 2000 into early 2001.  And

7    then they pursued a shareholder approval

8    of a stock option plan amendment in 2001.

9    Q.    And why did they do that in

10   2001?

11   A.    In order to secure

12   additional shares for future grants.

13   Q.    How many additional shares

14   were secured in that way?

15   A.    I don't recall.  I think the

16   number that was approved by the

17   stockholders of additional shares was

18   something on the order of 2.5 or 2.75

19   million.

20   Q.    And how many shares were

21   obtained in 2000 and early 2001 through

22   the program of seeking shares back from

23   or options back from employees?

24   A.    I don't recall the specific

1   Richard Fontaine.

2          Q.     Do you know whether he still

3   has some relationship with DaVita?

4          A.     I believe he's still on the

5   board of directors.

6                 (Exhibit-5 marked for

7                 identification.)

8                 MR. SANDERS:  Just so we're

9                 clear, there's a couple of

10                November 22, 2000 letters, this is

11                the one that should say DV0238 at

12                the bottom.

13                THE WITNESS:  Correct.

14  BY MR. BRESKIN:

15         Q.     Mr. Udicious, you should be

16  looking at a letter from Mr. Coulombe to

17  you dated November 22, 2000 with a copy

18  to Jonathan Wolin.  Is that what you're

19  looking at as Exhibit 5?

20         A.     Yes.

21         Q.     Did you draft this letter?

22         A.     I prepared the form of this

23  letter, yes.

24         Q.     And is my understanding

1  correct that this is a form letter that

2  was sent to a number of DaVita employees

3  who had stock options?

4        A.    Yes.

5        Q.    And the letter was sent as a

6  form letter with a signature block for

7  the employee's signature; is that

8  correct?

9        A.    Yes.

10       Q.    And did you do that or was

11 there somebody on your staff that did

12 that, how did that work?

13       A.    Somebody on my staff.

14       Q.    Who was responsible for

15 sending those letters out?

16       A.    The letters were prepared by

17 my assistant at the time, Nadia Antoun,

18 using information provided to her by the

19 DaVita accounting department in Tacoma,

20 Washington who kept the information

21 regarding the outstanding stock options.

22 In particular a gentleman named Aaron

23 Westlund.  She prepared the letters and

24 then my recollection is that the letters

1    the witness may answer.

2         THE WITNESS:  I don't recall

3    specifically who received stock

4    options after that period of time.

5    There were certainly many people

6    who did.

7  BY MR. BRESKIN:

8         Q.    You were not involved in the

9  redistribution to those individuals?

10         A.    I was involved in the

11  preparation of the agreements relating to

12  subsequent option grants but I was not

13  involved in the determination of who

14  would receive options after that date,

15  except to the extent I was involved in

16  discussions with Mr. Thiry to whom I

17  reported regarding option grants for

18  employees who reported to me.

19         Q.    The Answer says:  The

20  successful relinquishment program also

21  allowed DaVita to obtain shareholder

22  approval to issue another 2.75 million

23  option shares, which were also

24  distributed so as to attract and retain

1    the most valuable DaVita team members.

2                    First of all, is that

3    accurate that the relinquishment program

4    that included Mr. Coulombe's options

5    allowed DaVita to obtain shareholder

6    approval for the issuance of another 2.75

7    million option shares?

8          A.    Yes.   The relinquishment

9    contributed to the ability to get 2.75

10   million shares rather than getting

11   approval for a much lower number of

12   shares.

13         Q.    Can you explain that a

14   little more to me, how those two things

15   go together?

16         A.    In looking at a proposal to

17   stockholders to approve additional option

18   shares investors, in particular

19   institutional investors, look at the pool

20   of existing options that are available to

21   the employees of the company, both

22   options that are outstanding and

23   unexercised as well as shares remaining

24   in plans that are available for future



21250 Hawthorne Boulevard, Suite 800
Torrance, CA 90503-5517
Tel: (800) 310-4872  Fax: (310) 792-8928

November 22, 2000

Steve Udicious
General Counsel
DaVita Inc.
21250 Hawthorne Blvd., Suite 800
Torrance, CA  90503-5517

Dear Steve:

As of the date of this letter, I hereby voluntarily relinquish my stock options with the grant date
and exercise prices listed below.  I understand that by doing so, I will not be eligible for an
additional option grant for a period of six months from the date of this letter.  I also confirm that
I have not been promised replacement options or any other form of consideration in exchange for
relinquishing these options.

| Grant Dates | Options | Exercise Price |
|---|---|---|
| 04/24/1997 | 5,833 | $18.75 |
| 04/24/1997 | 25,000 | $18.75 |
| 02/27/1998 | 30,000 | $32.19 |

Sincerely,

Leonard Coulumbe

cc:   Jonathan Wolin

**Declaration of
J. Sanders - 13**

EXHIBIT
5
8/8/06

**DV 0238**
Coulumbe



# CONFIDENTIAL MEMORANDUM

**TO:**    Kent Thiry
Joe Mello
Rich Whitney
Bill Schilling

**FROM:**    Steve Udicious

**DATE:**    February 27, 2000

**RE:**    Updated WOOTM Report

Notes

- "Kept" = Affirmative response that decided to keep options
- "Kept" and "No Response" have same effect – options still outstanding
- Employees who received September 2000 grants were not solicited, will be solicited in March 2001

I.    Options greater than $15.00

| | | |
|---|---|---|
| Relinquished | | |
| Kept | 937,204 | 65% |
| No Response | 353,755 | 11% |
| | 438,781 | 24% |
| | 1,729,740 shares | 100% |

II.    Options $15 - $19 (subset of I)

| | | |
|---|---|---|
| Relinquished | | |
| Kept | 408,644* | 39% |
| No Response | 348,643 | 34% |
| | 283,279 | 27% |
| | 1,040,566 shares | 100% |

* 229,737 shares from VPs, 123,244 shares from directors, 55,663 shares from below director level

**Declaration of
J. Sanders - 14**

EXHIBIT
10
8/8/06

**Confidential
DV 2281**
Coulombe

## VP and Director Participation $15 - $19 (*indicates split decision, listed in both categories)

### Relinquished

| Title | Name | Share Numbers | Share Price |
|---|---|---|---|
| VP | Bonnie Greenspan | | |
| | Joanne Otsuji | 46,417 | $18.75 |
| | Stan Lindenfeld* | 39,279 | $18.75 |
| Directors | Anthony Gabriel | 97,624 | $18.75 |
| | Dave Manheim* | 7,500 | $19.00 |
| | John Russo | 46,417 | $18.75 |
| | Lenny Coulombe | 38,494 | $17.98 |
| | | 30,833 | $18.75 |
| | Sandy Hoffman | 30,000 | $32.19 |
| | | 3,333 | $17.78 |
| | | 5,000 | $32.19 |

### Kept

| Title | Name | Share Numbers | Share Price |
|---|---|---|---|
| VP | Stan Lindenfeld* (required because of divorce settlement) | 97,625 | $18.75 |
| Directors | Carole Shepherd | | |
| | Cheryl MacDougall | 46,417 | $18.75 |
| | | 12,282 | $15.08 |
| | Dave Manheim* | 8,010 | $16.34 |
| | Jerry Bell | 4,167 | $15.75 |
| | Lynn McGowan | 21,417 | $18.75 |
| | | 5,555 | $17.85 |
| | Melody McCollum | 25,000 | $18.75 |
| | Rudy Aguilar | 21,417 | $18.75 |
| | | 46,417 | $18.75 |

### No Response

| Title | Name | Share Numbers | Share Price |
|---|---|---|---|
| VP | Glenn Jones | 6,230 | $16.34 |
| | | 22,250 | $15.08 |
| | John McDonough (all options expire 3/15/01 as a result of resignation) | 80,000 | $19.00 |
| Directors | Dale Alderman | | |
| | | 4,166 | $18.75 |
| | Jack White | 7,500 | $24.38 |
| | Janet Stephens | 46,417 | $18.75 |
| | Linda Considine | 3,500 | $15.31 |
| | | 12,500 | $32.19 |
| | Marie Ficarella | 25,000 | $18.75 |
| | Sheldon Reich | 46,417 | $18.75 |
| | | 8,334 | $18.75 |
| | | 7,500 | $24.38 |

Confidential
DV 2282
Coulombe

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON

3    AT SEATTLE

4

5    LENNY COULOMBE,                  )
                                      )
6         Plaintiff,                  )
                                      )
7         v.                          )    No. CV6-504 JLR
                                      )
8    TOTAL RENAL CARE HOLDINGS,       )
     INC., DAVITA, INC.,              )    COPY
9                                     )
          Defendants.                 )
10   _____)

11

12

13        DEPOSITION UPON ORAL EXAMINATION OF

14            LEONARD J. COULOMBE

15

16

                 9:30 a.m.
17            August 25, 2006
         4800 Washington Mutual Tower
18           1201 Third Avenue
             Seattle, Washington
19

20

21

22

23

24   **Declaration of**
     **J. Sanders - 16**        **Exhibit B**

25      Reported by Mary C. Tevis, CCR No. 29906

1                          APPEARANCES

2

3

4    For the Plaintiff:        David Breskin
                               Attorney at Law
5                              Short Cressman & Burgess
                               Suite 3000
6                              999 Third Avenue
                               Seattle, Washington   98104
7                              Phone: 206-682-3333
                               email: dbreskin@scblaw.com
8

9

10   For the Defendant:        James Sanders
                               Attorney at Law
                               Perkins Coie
11                             4800 Washington Mutual Tower
                               1201 Third Avenue
12                             Seattle, Washington   98101
                               Phone: 206-359-8000
13                             email: jsanders@perkinscoie.com

14

15   Also present:             Steven M. Cooper

16

17   Videographed by:          Mike Elderkin

18

19

20

21

22

23

24

25   **Declaration of
     J. Sanders - 17**

1    WHEREUPON, the following proceedings were held and

2    testimony taken of the witness, who was called at the

3          instance of the Defendant, to-wit:

4          THE VIDEOGRAPHER:  Good morning.  We are

5    now on the record.

6    Here begins Videotape No. 1, Volume I, in the

7    deposition of Leonard J. Coulombe in the matter of

8    *Leonard Coulombe vs. Total Renal Care Holdings,*

9    *Incorporated, et al,* in the United States District

10   Court, Western District of Washington at Seattle.  Case

11   number is CV6-504 JLR.

12   Today's date is August 25th, 2006, and the time is

13   approximately 10:32 a.m.

14   The video operator today is Mike Elderkin of Tevis

15   Court Reporting, 9709 239th Street Southwest, Edmonds,

16   Washington, 98020.

17   This deposition is taking place at the offices of

18   Perkins Coie, 1201 Third Avenue, 48th Floor, Seattle,

19   Washington, 98101, and was noticed by James E. Sanders

20   of Perkins Coie.

21   Counsel, please voice-identify yourselves and state

22   whom you represent.

23          MR. SANDERS:  This is James Sanders for

24   defendant, DaVita.

25          MR. BRESKIN:  David Breskin.  I'm

**Declaration of
J. Sanders - 18**

1   Q.   What did she tell you she was going to do?

2   A.   She felt that if people didn't, it was like signing a

3        death warrant.

4   Q.   Okay, was she more specific than that?

5   A.   No.

6   Q.   Okay.  Is she still with DaVita?

7   A.   Yes.

8   Q.   And do you know, did she in fact turn in her options?

9   A.   Yes.

10  Q.   And you may have said this already, but let me just make

11       sure:  Ms. LaMunyon did not turn in her options, to the

12       best of your knowledge?

13  A.   That's correct.

14  Q.   Okay, she kept them.

15            All right, Cheryl MacDougall, was that the last

16       person?

17  A.   Yes.

18  Q.   And when did you have your discussion with Ms.

19       MacDougall?

20  A.   It was right around that time in November, and Cheryl

21       and I were very close; we basically were the two

22       directors of compliance for the company at the time,

23       reporting directly to Jonathan Wolin, so she and I were

24       of equal stature, and so -- and we had a lot of close

25       interaction and we spoke almost on a daily basis, so we

```
1        became, you know, friends, both in work and outside of

2        work.

3    Q.  And what you were talking about on this occasion?

4    A.  Whether or not she was going -- she was talking to me

5        whether or not she was going to turn her options in.

6    Q.  What did she tell you?

7    A.  She told me that she did, and then she relinquished that

8        -- some of her options were around $15 or $17, pretty

9        close to what the price -- the price started to escalate

10       right around that period of time, and she was having

11       second thoughts about some of her options which were

12       priced closer to the $2 or $3 from the current price,

13       and she, I think -- although I don't know -- but she

14       told me that she was planning to ask Jonathan if she

15       could relinquish her giving them up.

16   Q.  And how did you respond when she told you that?

17   A.  I said, If I was in the same position as her with

18       options that were that close, that I would have to think

19       a lot harder about it.

20   Q.  Do you know whether in fact she was able to pull back

21       her relinquishment?

22   A.  Yes.

23   Q.  She was able to?

24   A.  Yes.

25   Q.  Okay.  Did the two of you discuss anything else?
```

1   anything to suggest that there would be any negative

2   repercussions for not participating?

3 A.  Not higher up, no.

4 Q.  Okay, it was just either at her level or below?

5 A.  Yes.

6 Q.  But Ms. Haight, did she tell you that anybody had ever

7   suggested to her that it would be bad for her career to

8   not participate in this?

9 A.  No.

10 Q.  Nobody at all?

11 A.  Not that I know of.  I mean, I can't speak for Helen.

12 Q.  Do you know, is Ms. MacDougall still with DaVita?

13 A.  Yes.

14 Q.  And she did in fact not relinquish some of her options,

15   right?

16 A.  Yes, I think she gave some up, but some she didn't.

17 Q.  Have you ever learned from her or from any other source

18   that anything negative ever occurred to her as a result

19   of pulling back some of her relinquishments?

20 A.  No.

21                      (Exhibit No. 11 was marked for

22                       identification.)

23 Q.  Mr. Coulombe, Exhibit 11, which you have in front of you

24   there --

25 A.  Yes.

```
 1    Q.    -- do you recognize that document?

 2    A.    Yes.

 3    Q.    Have you seen it before?

 4    A.    Yes.

 5    Q.    Did you receive this on or about December 6th, 2000?

 6    A.    Yes.

 7                              (Exhibit No. 12 was marked for

 8                               identification.)

 9    Q.    All right, Mr. Coulombe, handing you what's been marked

10          as Exhibit 12, do you recognize this document?

11    A.    Yes.

12    Q.    Did you receive this document on or about December 19th,

13          2000?

14    A.    I don't recall on this one.

15    Q.    Have you seen it before today?

16    A.    Yes.

17    Q.    Are you sure you've received it at some point?

18    A.    No, I'm not really sure that I received it, but I did

19          see it when we took Steve Udicious's deposition.

20    Q.    So you may or may not have seen it before that; you're

21          not sure?

22    A.    Right.

23    Q.    Do you remember otherwise being told in any way that if

24          you wanted to cancel any of your earlier

25          relinquishments, you could?
```

1   A.   Yes.

2   Q.   Okay, and was that Mr. Wolin that told you that?

3   A.   Yes.

4   Q.   And how did you respond?

5   A.   I had told him that I was going to relinquish them and

6        that I would relinquish them.

7   Q.   So you told him that you were going to stick with your

8        original decision?

9   A.   Yes.

10  Q.   When he approached you about changing your mind, had you

11       already signed and returned Exhibit 10?

12  A.   I don't remember; I don't remember the timeline.  I may

13       have -- I believe I already did sign it and send it in

14       because the date on it was November, and I believe this

15       -- the date on this is the 19th of December, and I

16       believe that Jonathan -- if I didn't receive this, then

17       he would have spoken to me about it.

18  Q.   Okay.  Well, can you put it in time at all, in terms of

19       Exhibit 10, at some point after you had signed and

20       returned Exhibit 10, did somebody come to you, even

21       verbally or through a memo like this, and let you know

22       you had the option of going back and cancelling the

23       relinquishment if you wanted to?

24  A.   I heard it indirectly through Cheryl, and then later on

25       directly from Jonathan.

1   Q.   And are you reasonably comfortable that it was after you

2        had signed and returned Exhibit 10?

3   A.   Yes.

4   Q.   Did you understand, when you signed and turned in

5        Exhibit 10, and then, you know, declined the opportunity

6        to cancel it, that you were in fact relinquishing these

7        option shares?

8   A.   Yes.

9   Q.   And you did that knowingly, right?

10  A.   Yes.

11  Q.   And willingly?

12  A.   Yes.

13  Q.   Did you expect to get anything in return,

14       notwithstanding Mr. Wolin's comments?

15  A.   Yes.

16  Q.   And what was that?

17  A.   I expected that at some point in the future that I would

18       be compensated through bonuses or some form of reissue

19       of stock options, that at some point I might get that,

20       although I realized, intellectually, that there was no

21       promise associated with that.

22  Q.   Mr. Wolin hadn't made any implicit promises to you that

23       he would make sure that you got grants or anything like

24       that, did he?

25  A.   No.

CERTIFICATE

STATE OF WASHINGTON )
                                     )     ss
COUNTY OF KING          )

I, the undersigned Notary Public in and for the State of Washington, do hereby certify:

Leonard J. Coulombe, appearing at the instance of the Defendants, appearing before me at the time and place indicated, in said transcript, said deponent, before examination, was by me duly sworn to testify the truth, and that the testimony thereupon given was stenographically recorded by me and transcribed under my direction.

I further certify that I am in no way related to any party to the cause of action concerned, nor to any of counsel, nor do I have a financial interest in the event of the cause.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the 30th day of August 2006.

_____
Mary C. Tevis, Notary Public
of the State of Washington,
residing at Edmonds.

MARY C. TEVIS
COMMISSION EXPIRES
NOTARY
PUBLIC
JULY 7, 2009
STATE OF WASHINGTON



November 22, 2000

Steve Udicious
General Counsel
DaVita Inc.
21250 Hawthorne Blvd., Suite 800
Torrance, CA  90503-5517

Dear Steve:

As of the date of this letter, I hereby voluntarily relinquish my stock options with the grant date and exercise prices listed below.  I understand that by doing so, I will not be eligible for an additional option grant for a period of six months from the date of this letter.  I also confirm that I have not been promised replacement options or any other form of consideration in exchange for relinquishing these options.

| Grant Dates | Options | Exercise Price |
| --- | --- | --- |
| 04/24/1997 | 5,833 | $18.75 |
| 04/24/1997 | 25,000 | $18.75 |
| 02/27/1998 | 30,000 | $32.19 |

Sincerely,

*Leonard J. Coulombe*

Leonard Coulumbe

cc:   Jonathan Wolin

**Declaration of
J. Sanders - 26**

Exhibit No. 10
Witness COULOMBE
Date 8-25-06
Mary Tevis, Reporter

DV 0238

Coulumbe

# Transcript of Steven Udicious

**Case:** Coulombe v. Total Renal Care

**Date:** September 14, 2006



Phone: 206.287.9066
Fax: 206.287.9832
e-mail: info@buellrealtime.com
Internet: www.buellrealtime.com

**Declaration of
J. Sanders - 27**

**Exhibit C**

Page 1

14:02:30                  UNITED STATES DISTRICT COURT

14:02:30            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

14:02:30     ----------------------------------------------------

14:02:30     LEONARD COULOMBE,              )

14:02:30                   Plaintiff,       )

14:02:30          vs.                       ) CV06-504

14:02:30     TOTAL RENAL CARE HOLDINGS,     )

14:02:30     INC., DAVITA INC.,             )

14:02:30                   Defendants.      )

14:02:30     _____

14:02:30            Deposition Upon Oral Examination of

14:02:30                      STEVEN UDICIOUS

14:02:30     ----------------------------------------------------

14:02:30                   1:30 p.m. - 5:10 p.m.

14:02:30                   September 14, 2006

14:02:30                999 Third Avenue, Suite 3000

14:02:30                   Seattle, Washington

14:02:30     Mary M. Paradise, RPR, CCR, CSR

14:02:30     CSR 2469

Declaration of
J. Sanders - 28

b5014832-1146-4048-b202-98dac987460f

| | | |
|---|---|---|
| 14:02:30 | 1 | A P P E A R A N C E S |
| | 2 | |
| 14:02:30 | 3 | FOR THE PLAINTIFF:    DAVID E. BRESKIN |
| 14:02:30 | 4 | Attorney at Law |
| 14:02:30 | 5 | Short Cressman & Burgess |
| 14:02:30 | 6 | 999 Third Avenue |
| 14:02:30 | 7 | Suite 3000 |
| 14:02:30 | 8 | Seattle, Washington 98104 |
| | 9 | |
| 14:02:30 | 10 | FOR THE DEFENDANTS    JAMES SANDERS |
| 14:02:30 | 11 | Attorney at Law |
| 14:02:30 | 12 | Perkins Coie |
| 14:02:30 | 13 | 1201 Third Avenue |
| 14:02:30 | 14 | Suite 4800 |
| 14:02:30 | 15 | Seattle, Washington 98101 |
| 14:02:30 | 16 | and |
| 14:02:30 | 17 | STEVEN M. COOPER |
| 14:02:30 | 18 | Attorney at Law |
| 14:02:30 | 19 | DaVita General Counsel |
| 14:02:30 | 20 | 601 Hawaii Avenue |
| 14:02:30 | 21 | El Segundo, California 90245 |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

**Declaration of
J. Sanders - 29**

b5014832-1146-4048-b202-98dac987460f

| | | |
|---|---|---|
| 14:02:30 | 1 | Whereupon, |
| 14:02:30 | 2 | STEVEN UDICIOUS, |
| 14:02:30 | 3 | having been duly sworn was called as a witness |
| | 4 | herein and was examined and testified as follows: |
| 14:02:30 | 5 | E X A M I N A T I O N |
| 14:02:30 | 6 | BY MR. BRESKIN: |
| 14:02:31 | 7 | Q.  Mr. Udicious, I'm going to ask you the |
| | 8 | formality of stating your name and your address for |
| | 9 | the record? |
| 14:02:37 | 10 | A.  Steven Udicious, 1300 Wendover Road, |
| | 11 | Rosemont, Pennsylvania, 19010. |
| 14:02:44 | 12 | Q.  Okay.  And do you have an understanding of |
| | 13 | why you're here today? |
| 14:02:49 | 14 | A.  Yes. |
| 14:02:49 | 15 | Q.  Tell me what that is. |
| 14:02:51 | 16 | A.  The Rule 30(b)(6) deposition for the items |
| | 17 | that were noted in the notice of deposition. |
| 14:02:59 | 18 | Q.  Okay.  So you understand you're appearing |
| | 19 | today as the defendant corporation's |
| | 20 | representative -- |
| 14:03:05 | 21 | A.  Yes. |
| 14:03:05 | 22 | Q.  -- and testify as to the corporation's |
| | 23 | knowledge? |
| 14:03:08 | 24 | A.  Yes. |
| 14:03:08 | 25 | Q.  As opposed to my prior deposition of you, |

**Declaration of
J. Sanders - 30**

b5014832-1146-4048-b202-98dac987460f

1    that correct?

2        A.  Yes.

3        Q.  Okay.  The next bullet point says, "you

4    agreed in April that you would return" -- "would

5    turn in your out of the money options.  You now

6    have the opportunity to voluntarily return your out

7    of the money options in order to expand the pool

8    for all participants."  Then there's a bracket,

9    "but remember those below director were not

10   informed about this in April," close bracket.

11       A.  Uh-huh.

12       Q.  Okay.  Now, I'm really confused.  So in

13   April of 2000, there was an agreement that the

14   directors made to return their shares?

15       A.  In April of 2000, there were discussions

16   ongoing throughout the management team about people

17   getting more stock options.  The company had gone

18   through tremendous upheaval beginning in the

19   beginning of 1999.  The stock price had dropped

20   precipitously.  People were concerned that -- about

21   having an incentive to continue to work for the

22   company, particularly they cited that they had

23   options that were out of the money and were

24   essentially worthless and were hoping to get

25   additional option grants.

Declaration of
J. Sanders - 31

b5014832-1146-4048-b202-98dac987460f

15:15:56   1          But as we've discussed, the pool of grants

           2   is limited, and it's not an infinite pool that the

           3   company can pull from to make grants to people.  So

           4   there was discussion about it at that time about a

           5   way to find more options to be available --

           6   available for people, and people were talking

           7   generally about these concepts of giving options

           8   back, but nothing had yet been implemented.

15:16:25   9          Q.  No one had yet agreed in April to return

          10   their options, correct?

15:16:28  11          A.  There was no written agreement in place

          12   that anybody had, whether there were people who, in

          13   conversations, had expressed a willingness to do

          14   that, because they understood the needs of the

          15   company, I -- I think that was occurring.

15:16:41  16          Q.  Well, I just want to be clear on this.

          17   The first sentence says, "you agreed in April that

          18   you would turn in your out of the money options."

          19   There weren't any -- there wasn't any director who

          20   had, in fact, had agreed in April to return their

          21   options?

15:16:56  22          A.  Not -- not in a written document, no.

15:16:58  23          Q.  Or otherwise?

15:17:01  24          A.  I can't say what -- there were

          25   conversations going on in the management team, and

Buell Realtime Reporting, LLC
206-287-9066

**Declaration of**
**J. Sanders - 32**

b5014832-1146-4048-b202-98dac987460f

1      employees in 2000.  The scope of this request

2      includes any proposed -- purposes or benefits that

3      the defendant contemplated in seeking return of the

4      stock options.

16:38:33    5           Is there anything additional, beyond what

6      you testified to at your August 8th deposition, as

7      the rationale and purpose for this program that

8      you've learned through your designation as the

9      company's representative today or that the company

10     has?

16:38:53   11      A.  No, I -- as I recall my -- my testimony, I

12     think the rationale was stated in the various memos

13     and talking points that we've gone over.

16:39:40   14           MR. BRESKIN:  I need to take a break for a

15     minute.  Why don't we take a five minute break.

16:39:48   16           MR. SANDERS:  Okay.

16:39:49   17               (A short recess was then taken.)

16:54:00   18     BY MR. BRESKIN:

16:54:00   19      Q.  I want to -- I want to make sure I

20     understood the response you gave me earlier,

21     because it was confusing, perhaps only to me, from

22     your prior deposition.  But in your prior

23     deposition, at page 17, at the bottom of that page,

24     I -- I had asked you, starting at about line 18,

25     what Mr. Thiry's role was with regard to analyzing

Declaration of
J. Sanders -33

b5014832-1146-4048-b202-98dac987460f

1    the different proposals that were for increasing

2    the number of options, and you gave me a long

3    answer that was full of a lot of information.

16:54:51    4    But basically, as I understood this

5    answer, you outlined two different proposals or

6    options.  One way was to implement this WOOTM

7    program for employees to return their options, and

8    the other was to go to the board and get approval

9    for amendment of the stock option plans to increase

10    the number of shares.  Do you see your response

11    there, on page 18, where we talked about that?

16:55:21    12    A.  Yes, but it was to go to the shareholders,

13    not the board, for the increase, but yes.  Yes.

16:55:25    14    Q.  Okay.  So you had earlier said that both

15    of those things were done simultaneously?

16:55:33    16    A.  Well, not literally simultaneously, but

17    simultaneously in the sense that that decision was

18    made to pursue both.  The relinquishment program,

19    and then at the next annual meeting of the

20    stockholders, which was later in 2001, to seek

21    approval of an amendment to increase the number of

22    shares under the existing plans.

16:55:58    23    Q.  Okay.  But in terms of just the sequence

24    of events, the program to get the employees to

25    return their shares came before going to the

**Declaration of**
**J. Sanders -34**

b5014832-1146-4048-b202-98dac987460f

1    shareholders?

16:56:11    2        A.  Yes.

16:56:11    3        Q.  All right.  And in fact, you would have to

4    know how many shares you actually received back

5    before you would know how many you wanted to ask

6    the shareholders to authorize, correct?

16:56:24    7        A.  Yes, the number of shares that we had --

8    had been returned would impact how many shares we

9    could ask the shareholders for.  Yes, that's true.

16:56:31    10       Q.  Was there a total number of shares that

11   had been decided upon as the increase when the

12   decision was made to implement the program to

13   return the shares and to go to the shareholders?

16:56:47    14       A.  I think the decision was to -- to go for

15   the maximum amount from our shareholders that we

16   felt we could get approved.  Obviously, we would

17   not want the shareholders to vote it down, because

18   then we would have no increase.  So the idea was to

19   go for the number that was the largest number, but

20   we felt very confident that the shareholders would

21   approve.

16:57:12    22       Q.  Do you remember what that number was?

16:57:13    23       A.  I -- I think the number that ultimately

24   was submitted to the shareholders was 2.75 million

25   shares.

**Declaration of
J. Sanders -35**