UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEONARD COULOMBE,

    Plaintiff,

  v.

TOTAL RENAL CARE HOLDINGS, INC., et al.,

    Defendants.

CASE NO. C06-504JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on cross-motions for summary judgment (Dkt. ## 16, 30). Although Defendant DaVita, Inc. ("DaVita")[1] has requested oral argument, the court finds these motions appropriate for disposition on the basis of the parties' briefing and supporting evidence. For the reasons stated below, the court DENIES Plaintiff's motion and GRANTS DaVita's motion.

---

[1] This action names two Defendants, DaVita and Total Renal Care Holdings, Inc. The latter entity, however, is merely the former name of DaVita. The court refers to DaVita as the sole Defendant throughout this order.

ORDER – 1

## II. BACKGROUND[2]

Plaintiff Leonard Coulombe was a DaVita employee from 1996 until his termination in November 2005. On three occasions from 1997 to 1998, DaVita awarded Mr. Coulombe stock options. DaVita's stock price peaked at just over $36 per share in June 1998, and then declined sharply. In March 2000, the share price reached its nadir at $2.56 per share. Some of Mr. Coulombe's stock options had an exercise price of $18.75 per share; the remainder had an exercise price of $32.19.

In 2000, many of DaVita's employees were in the same position as Mr. Coulombe. They had stock options, but they were "way out of the money," or, in DaVita's parlance, "WOOTM." Stock options typically serve to motivate employees to strive to advance the company's interests so that the employees can benefit from the concomitant increase in stock price. By November 2000, with its share price still mired well below its late 1990s highs, DaVita was concerned that the WOOTM options were destroying its employees' morale. It wished to award more options, options that would be less WOOTM and thus more motivating for its employees. It could not do so, however, unless it had available options in its employee stock option "pool."

DaVita adopted the following solution to its quandary: it would approach its board of directors to authorize an increase in the size of its stock option pool; and it would approach its employees to see if they would relinquish some of their WOOTM options and return them to the pool. DaVita distributed notice of its plan to its employees. DaVita informed its employees that they could relinquish their WOOTM options by written agreement, or they could choose to keep them. By the end of February 2001,

---

[2] The court summarizes the background of this action merely to provide context for its analysis. The parties should not mistake the court's summary for findings of fact.

ORDER – 2

employees had relinquished approximately two-thirds of the WOOTM options outstanding, and retained the remainder.

Mr. Coulombe was among those employees who relinquished his WOOTM options. On November 22, 2000, he wrote a letter to DaVita's general counsel:

> I hereby voluntarily relinquish my [1997 and 1998] stock options . . . . I understand that by doing so, I will not be eligible for an additional option grant for a period of six months from the date of this letter. I also confirm that I have not been promised replacement options or any other form of consideration in exchange for relinquishing these options.

Sanders Decl. at 26. Although there are disputes about why Mr. Coulombe chose to relinquish his options, there is no dispute that he relinquished them.

After relinquishing his 1997 and 1998 stock options, Mr. Coulombe worked for five more years at DaVita. During that time, DaVita's stock price rebounded. In the last year, it has generally traded between $50 and $60 per share. In November 2005, DaVita terminated Mr. Coulombe. The next month, Mr. Coulombe requested that he be allowed to exercise the stock options that he had relinquished in November 2000, a transaction that would have netted Mr. Coulombe more than a million dollars. DaVita denied his request.

Mr. Coulombe brought this action, asserting a variety of theories of relief. The motions before the court focus solely on Mr. Coulombe's claim under RCW § 49.52.050 and § 49.52.070.

### III. ANALYSIS

On a motion for summary judgment, the court is constrained to draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears

ORDER – 3

the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). When confronted with purely legal questions, the court does not defer to the non-moving party.

Mr. Coulombe seeks relief under two Washington statutes. The first, RCW § 49.52.050 ("Section 050") is a criminal statute barring certain labor practices:

> Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who
>
> (1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; [or]
>
> (2) Wilfully and with intent to deprive the employee of any part of his wages, shall pay any employee a lower wage that the wage such employer is obligated to pay such employee by any statute, ordinance, or contract; . . .
>
> Shall be guilty of a misdemeanor.

The second statute, RCW § 49.52.070 ("Section 070"), provides a civil remedy for certain violations of Section 050:

> Any . . . employer who shall violate any of the provisions of subdivisions (1) and (2) of RCW 49.52.050 shall be liable in a civil action by the aggrieved employee or his assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees: PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.

Mr. Coulombe claims that DaVita violated Section 050 by receiving his stock options after he relinquished them in November 2000, and he seeks a civil remedy for this violation under Section 070. Washington enacted both statutes in 1939 as "Anti-

ORDER – 4

Kickback" measures to "prevent abuses by employers in a labor-management setting, e.g., coercing rebates from employees in order to circumvent collective bargaining agreements." Ellerman v. Centerpoint Prepress, Inc., 22 P.3d 795, 798 (Wash. 2001). In support of their contentions regarding the applicability of the statutes to DaVita's receipt of Mr. Coulombe's relinquished stock options, the parties have submitted six briefs totaling more than 70 pages. The briefs raise a cornucopia of interesting legal questions. Fortunately, the court need only answer one of them.

Assuming that DaVita violated Section 050, Mr. Coulombe's civil remedy arises solely from Section 070. The "benefits" of Section 070, however, are not available to "any employee who has knowingly submitted to" the violation of Section 050 of which he complains. RCW § 49.52.070. If Mr. Coulombe "knowingly submitted" to DaVita's Section 050 violation, he has no civil remedy, and DaVita is entitled to summary judgment.

Washington's courts have considered the "knowingly submitted" proviso of Section 070 in only one published decision: Chelius v. Questar Microsystems, Inc., 27 P.3d 681 (Wash. Ct. App. 2001).[3] In that case, two employees brought claims under Section 070 when their employer failed to pay their wages. The employer claimed that the employees had "knowingly submitted" to the violation of Section 050 because they had repeatedly agreed to defer payment of their wages, and had not objected to the employer's sporadic pay practices. Id. at 682-83.

---

[3]The parties devote a portion of their briefs to a debate over whether they may properly cite the unpublished decisions of the Washington Court of Appeals. No federal rule addresses this question, but this court defers to the Washington Court of Appeals itself, which decrees that parties before it may not cite its unpublished decisions. Wash. R. App. P. 10.4(h). The court therefore declines to cite the unpublished decisions that have interpreted the "knowingly submitted" proviso of Section 070, but notes that they are in accord with Chelius.

ORDER – 5

The Chelius court rejected the employer's defense. It held that to have "knowingly submitted" to a withholding of wages, "the employees must have deliberately and intentionally deferred to [the employer] the decision of whether they would *ever* be paid. Id. (emphasis added). The court found that although the employees had agreed to defer their compensation, they had never agreed to forego compensation. Id. at 683.

Chelius dictates a different outcome here, because the undisputed evidence shows that Mr. Coulombe deliberately and intentionally relinquished his right to ever exercise his 1997 and 1998 stock options. Mr. Coulombe's November 22 letter establishes conclusively that he understood he was giving up his options, and that he knew he would not be paid for them. Indeed, Mr. Coulombe does not dispute that he "deliberately and intentionally" relinquished his options, as Chelius requires. Instead, he provides evidence that he relinquished the options because he felt pressure from DaVita. This evidence, even construed in the light most favorable to Mr. Coulombe, does not bear on whether Mr. Coulombe "deliberately and intentionally" released his stock options.

The court finds it irrelevant that Mr. Coulombe did not "kn[o]w [that] the return of his options violated [Section 050]." Pl.'s Reply at 12. Section 070 requires only that the employee "knowingly" submit to an employer's violation of Section 050, not that the employee know that the employer's act is a violation of Section 050. See RCW § 49.52.070. Here, Mr. Coulombe "knowingly submitted" to returning his stock options to DaVita, and thus "knowingly submitted" to the violation of Section 050 for which he seeks relief.

Mr. Coulombe's efforts to advance a different interpretation of the "knowingly submitted" proviso of Section 070 are unavailing. He relies primarily on Schilling v. Radio Holdings, Inc., 961 P.2d 371 (Wash. 1998). Despite Mr. Coulombe's protestations to the contrary, Schilling does not address the meaning of the "knowingly submitted"

ORDER – 6

proviso. In Schilling, the court interpreted the meaning of "wilfully" in subsection two of Section 050. See id. at 374-375. The court mentioned the "knowingly submitted" proviso only once, and did so only to demonstrate the "Legislature's understanding of its ability to carve out exceptions to the double damages provision of the statute." Id. at 378 n.6. Mr. Coulombe suggests that when an employee knowingly submits to a violation of Section 050, he is "only" ineligible for double damages. Pl.'s Reply at 11. He is wrong. Under the plain language of the statue, an employee who knowingly submits to a violation of Section 050 is ineligible for all "benefits" of Section 070. RCW § 49.52.070. One of the "benefits" of Section 070 is a civil remedy for a violation of Section 050. Mr. Coulombe is, as a matter of law, ineligible for that benefit.

## IV. CONCLUSION

For the reasons stated above, the court GRANTS DaVita's summary judgment motion (Dkt. # 30) and DENIES Mr. Coulombe's motion (Dkt. # 16).

Dated this 16th day of November, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 7