UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LEONARD COULOMBE,

        Plaintiff,

   v.

TOTAL RENAL CARE HOLDINGS, INC., et al.,

        Defendants.

CASE NO. C06-504JLR

ORDER

## I. INTRODUCTION

This matter comes before the court on cross motions for summary judgment (Dkt. ## 52, 57). Although Defendant DaVita, Inc. ("DaVita")[1] has requested oral argument, the court finds these motions appropriate for disposition on the basis of the parties' briefing and supporting evidence. For the reasons stated below, the court GRANTS DaVita's motion for summary judgment (Dkt. # 52), and DENIES Plaintiff's

---

[1] As noted in the court's prior orders, this action names two Defendants. The court refers to DaVita as the sole defendant because Defendant Total Renal Care Holdings, Inc. is not a separate entity, but the former name of DaVita.

ORDER – 1

motion for partial summary judgment (Dkt. # 57). The court dismisses this action with prejudice.

## II.  BACKGROUND

DaVita operates kidney dialysis centers nationwide. Plaintiff Leonard Coulombe was an employee of DaVita from 1996 until November 2005. On three occasions from 1997 to 1998, DaVita awarded Mr. Coulombe stock options. The parties' dispute centers on whether Mr. Coulombe is entitled to exercise those options.

In the early and middle part of the 1990s, DaVita experienced a wave of growth; its stock price peaked at just over $36 per share in June 1998. Flock Decl. at 32 (Westlund Decl. ¶¶ 6, 7).[2] Then, in March 2000, its share price fell to its record low, $2.56 per share. Id. This sharp decline left many of DaVita's employees, including Mr. Coulombe, holding outstanding stock option shares that were priced well above the trading price, or in DaVita's parlance, "way out of the money" ("WOOTM"). Id. at 101 (Udicious Decl. ¶ 5). As described in the court's order of November 16, 2006:

> Stock options typically serve to motivate employees to strive to advance the company's interests so that the employees can benefit from the concomitant increase in stock price. By November 2000, with its share price still mired well below its late 1990s highs, DaVita was concerned that the WOOTM options were destroying its employees' morale. It wished to award more options, options that would be less WOOTM and thus more motivating for its employees. It could not do so, however, unless it had available options in its employee stock option "pool."
>
> DaVita adopted the following solution to its quandary: it would approach its board of directors to authorize an increase in the size of its stock option pool; and it would approach its employees to see if they would relinquish some of their WOOTM options and return them to the pool. DaVita distributed notice of its plan to its employees. DaVita informed its employees that they could relinquish their WOOTM options by written agreement, or they could choose

---

[2]DaVita supports its motion with declarations previously filed with the court, which it resubmitted as "Attachment D" to the Declaration of Brian Flock (Dkt. # 56). For ease of reference, the court's citations to these declarations and their attached exhibits include citations to page numbers of the Declaration of Mr. Flock.

ORDER – 2

> to keep them. [Flock Decl. at 102 (Udicious Decl. at ¶ 5).] By the end of February 2001, employees had relinquished approximately two-thirds of the outstanding WOOTM options, and retained the remainder. [Id. ¶ 6.]

Order of November 16, 2006 at 2-3 (Dkt. # 40).

Mr. Coulombe was among those employees who relinquished his WOOTM options. In November 2000, DaVita provided Mr. Coulombe with a form relinquishment letter. Mr. Coulombe waited several weeks before he signed the letter and returned it to DaVita. Id. at 8-9 (Coulombe Dep. at 79-80). The letter provides:

> I hereby voluntarily relinquish my [1997 and 1998] stock options . . . . I understand that by doing so, I will not be eligible for an additional option grant for a period of six months from the date of this letter. I also confirm that I have not been promised replacement options or any other form of consideration in exchange for relinquishing these options.

Id. at 78 (the "November 22, 2000 Letter"). Under the terms of the letter, Mr. Coulombe relinquished 60,833 option shares. Id. DaVita granted Mr. Coulombe these options on two occasions in April 1997, and on one occasion in February 1998 under written stock option agreements and plans ("1997 and 1998 Agreements"). Id. at 33 (Westlund Decl. ¶ 10); Wallace Decl. at 12-21 (1997 and 1998 Agreements) (Dkt. # 60). The options had exercise prices of $18.75 per share and $32.19 per share, respectively. Id. In November 2000, DaVita's stock was trading between $10 and $11 per share. Id. at 32 (Udicious Decl. ¶ 9). In December 2000, DaVita gave Mr. Coulombe the opportunity to revoke the November 22, 2000 Letter and elect to keep his WOOTM options. He declined to do so. Id. at 87-88 (Coulombe Dep. at 82-83).

Mr. Coulombe worked for five more years at DaVita. During that time, DaVita's stock price rebounded.[3] Mr. Coulombe benefitted from this turnaround; in the five years following his relinquishment of the WOOTM options, Mr. Coulombe exercised 40,000 of

---

[3] In March 2007, for instance, DaVita's stock was trading between $53 and $54 per share. Second Westlund Decl. ¶ 3 (Dkt. # 54).

ORDER – 3

his remaining option shares, which he sold for a net profit of $664,934. Flock Decl. at 33 (Westland Decl. ¶ 12). In November 2005, DaVita terminated Mr. Coulombe's employment. The next month, Mr. Coulombe sought to exercise the options that he relinquished in the November 22, 2000 Letter – a transaction that would have netted Mr. Coulombe more than a million dollars. Id. at 103, 105 (Udicious Decl. ¶ 8, Ex. A). DaVita denied his request.

Mr. Coulombe brought this action asserting a variety of theories of relief, including a claim that DaVita's collection back of his stock options violates Washington's rebate of wages or so-called anti-kickback statute, RCW § 49.52.050 ("Section 050") and its related civil enforcement provision, RCW § 49.52.070 ("Section 070"). Previously, the parties cross-moved for partial summary judgment on DaVita's liability for violation of the anti-kickback statute (Dkt. ## 16, 30). The court granted DaVita's motion, holding that Mr. Coulombe could not recover under the terms of the civil provision, Section 070, because he knowingly relinquished his stock options. See Order of November 16, 2006. In a second order, the court held that Mr. Coulombe did not have an implied right of action under the criminal provision, Section 050. See Order of February 2, 2007 (Dkt. # 50).

DaVita now moves for summary judgment on Mr. Coulombe's remaining claims: breach of contract, unpaid wages, and quantum meruit. Mr. Coulombe moves for partial summary judgment on his contract claims, arguing that, as a matter of law, his agreement to relinquish the stock options is void and unenforceable as violative of public policy.[4]

---

[4]Although Mr. Coulombe filed his cross motion for partial summary judgment 13 days after the dispositive motion deadline, the court considers the merits of the motion and thus denies DaVita's request to strike it as untimely.

ORDER – 4

### III.  ANALYSIS

On a motion for summary judgment, the court must draw all inferences from the admissible evidence in the light most favorable to the non-moving party. Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the opposing party must show that there is a genuine issue of fact for trial. Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The opposing party must present significant and probative evidence to support its claim or defense. Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991). When confronted with purely legal questions, the court does not defer to the non-moving party.

Because DaVita removed this action on the basis of the court's diversity jurisdiction, the substantive law of Washington applies. Stanford Ranch, Inc. v. Maryland Cas. Co., 89 F.3d 618, 624 (9th Cir. 1996). A federal court applying state law must apply the law as it believes the state supreme court would apply it. Gravquick v. Trimble Navigation Int'l Ltd., 323 F.3d 1219, 1222 (9th Cir. 2003) (citation omitted).

**A.    Mr. Coulombe's Breach of Contract Claims**

Mr. Coulombe argues that DaVita is contractually obligated to allow him to exercise the 60,833 option shares that he received under the 1997 and 1998 Agreements. For the reasons set forth below, the court finds that no genuine issue of material fact exists as to the parties' express rescission of the 1997 and 1998 Agreements. In addition, the court concludes that Mr. Coulombe's relinquishment of the options is not violative of public policy. Thus, the court grants DaVita's motion for summary judgment on the

ORDER – 5

breach of contract claims, and denies Mr. Coulombe's motion for partial summary judgment.

### 1. Undisputed Evidence Establishes the Parties' Rescission of the 1997 and 1998 Agreements.

DaVita argues that Mr. Coulombe rescinded his right to exercise the stock options by his November 22, 2000 Letter. Mutual rescission is an express or implied agreement between parties to an existing contract to discharge their duties under the contract. See, e.g., Woodruff v. McClellan, 622 P.2d 1268, 1269 (Wash. 1980) ("Rescission . . . occur[s] when there is a mutual consent to rescind the contract, or a demand to rescind by one side with acquiescence by the other . . . .") (citations omitted). An agreement to rescind must itself be a valid agreement, meaning all parties to the contract must assent to rescission and there must be a meeting of minds. Morango v. Phillips, 205 P.2d 892, 895 (Wash. 1949) (citations omitted). An assent to an offer of rescission may be express or implied. Id.

In the instant case, DaVita offered Mr. Coulombe – and all other DaVita employees – the choice of relinquishing WOOTM option shares. By providing Mr. Coulombe with the form relinquishment letter, DaVita expressly offered to rescind the parties' 1997 and 1998 Agreements. By signing and returning the November 22, 2000 Letter, Mr. Coulombe expressly assented to the offer. Mr. Coulombe testified that he did so willingly, and by his own admission, with full knowledge that he was giving up his WOOTM stock options. Flock Decl. at 89 (Coulombe Dep. at 88).

Mr. Coulombe counters that his relinquishment of stock options is unenforceable because it was a modification of the 1997 and 1998 Agreements, which was not supported by additional consideration. See, e.g., Flock Decl. at 78 (November 22, 2000 Letter) ("I have not been promised replacement options or any other form of consideration . . . ."). Indeed, it is well established that the modification of an agreement

ORDER – 6

must be supported by additional consideration. See Rosellini v. Banchero, 517 P.2d 955, 958 (Wash. 1974). There is "no consideration where one party is to perform some additional obligation while the other party is simply to perform that which he promised in the original contract." Id. (citation omitted). Mr. Coulombe thus emphasizes that DaVita "*never* incurred any additional duty or obligation," which, according to Mr. Coulombe, renders the relinquishment unenforceable. Resp. at 11 (emphasis in original).

Mr. Coulombe's argument is misplaced. The November 22, 2000 Letter was not a modification of a preexisting agreement because there is no evidence that either party agreed to perform an additional obligation. Rather, the express terms of the November 22, 2000 Letter demonstrate the parties' intent to rescind their prior agreements. Under the 1997 and 1998 Agreements, Mr. Coulombe received contractual rights to buy shares of stock. By awarding stock options, DaVita sought to promote its own interests – i.e., to retain and motivate employees by enabling them to benefit from DaVita's success. The November 22, 2000 Letter released the parties from these rights and obligations. Where such a rescission occurs, the parties' "reciprocal surrender of contractual rights supplies sufficient consideration." See Consol. Elec. Distribs. v. Gier, 602 P.2d 1206, 1210 (Wash. Ct. App. 1979) (citing S. Williston, Contracts § 1826 (3d ed. 1972)). Thus, the court concludes that the parties rescinded the 1997 and 1998 Agreements.

### 2. Mr. Coulombe Fails to Produce Evidence to Show That DaVita Induced His Assent to Relinquish the Stock Options by Duress.

Mr. Coulombe's contention that he relinquished his options out of fear that his supervisors would fire him, deduct his pay, or no longer view him as a "team player," see Resp. at 3, is insufficient as a matter of law to invalidate the parties' rescission. Mr. Coulombe fails to articulate any legal basis for his allegations. See id. at 3, 12- 15. In any event, the court presumes that Mr. Coulombe's contention is that duress invalidates his assent to the parties' rescission. Mr. Coulombe carries the burden to prove duress as

ORDER – 7

a defense to an express agreement. See Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc., 640 P.2d 1051, 1054 (Wash. 1982). To establish duress, Mr. Coulombe must prove more than "reluctance to accept or financial embarrassment." Id. He must produce "evidence that the duress *resulted from the other's wrongful or oppressive conduct*." Id. (emphasis added). "The mere fact that a contract is entered into under stress or pecuniary necessity is insufficient." Id. (citation omitted); see also Whitman Realty & Inv. Co. v. Day, 296 P. 171, 173 (Wash. 1931) ("[D]uress does not exist unless one, by the unlawful act of another, is induced to make a contract under circumstances which deprive him of the exercise of his free will.").

Mr. Coulombe fails to produce evidence to show that DaVita engaged in wrongful or oppressive conduct. It is undisputed that, at the time Mr. Coulombe relinquished the shares at issue, the stock lacked any monetary value. The memorandum DaVita circulated announcing its relinquishment program stated that the program was voluntary – i.e., "[y]ou do not have to turn these options in! . . . [w]e repeat, you can keep your WOOTM!" Flock Decl. at 19 (WOOTM Option Memorandum).[5] Mr. Coulombe testified that he made a knowing and willing decision to relinquish his options. Id. at 101 (Coulombe Dep. at 88). He testified that he received no pressure to relinquish or not relinquish his options at any time from anyone. Id. at 8-9 (Coulombe Dep. at 79-80). Mr. Coulombe waited several weeks between the time he received and signed the November 22, 2000 Letter. Id. at 7 (Coulombe Dep. at 74). And when presented with

---

[5] Indeed, Mr. Coulombe testified that he was aware that his colleague, Cheryl MacDougall, declined to relinquish her WOOTM shares. Flock Decl. at 84-85 (Coulombe Dep. at 82-83). Overall, about 100 employees, approximately one-third of DaVita's options holders, did not relinquish their WOOTM shares. Flock Decl. at 102 (Udicious Decl. ¶ 6). There is no evidence that any of these employees suffered an adverse employment action because of their decision.

ORDER – 8

the opportunity to revoke the letter one month later, Mr. Coulombe declined to do so. Id. at 87-88 (Coulombe Dep. at 82-83). There is no evidence that DaVita threatened to fire Mr. Coulombe, deduct his pay, or that anything his supervisors did or said served to deprive him of the exercise of his free will.[6] Cf. Delta County Bank v. McGranahan, 79 P. 796, 797 (Wash. 1905) (finding threat of criminal prosecution sufficient to establish duress).

The court therefore concludes that Mr. Coulombe fails to demonstrate a material issue of fact as to the existence of duress. Taking the evidence in a light most favorable to Mr. Coulombe, no reasonable juror could conclude that DaVita threatened or oppressed him, or that the surrounding circumstances deprived him of his free will. Without more, Mr. Coulombe's objective expression of assent in the November 22, 2000 Letter is controlling.

### 3. Mr. Coulombe's Relinquishment of Stock Options is Valid and Enforceable as a Matter of Public Policy.

Mr. Coulombe contends that the November 22, 2000 Letter is void as a matter of public policy because it was a collection of a wage rebate as proscribed by Section 050 of Washington's anti-kickback statute. As a general rule, a contract that is contrary to the terms and policy of an express legislative enactment is illegal and unenforceable. State v. Nw. Magnesite Co., 182 P.2d 643, 656 (Wash. 1947) (citation omitted). In his motion

---

[6]Mr. Coulombe repeatedly refers to a hastily arranged meeting at LAX Airport between himself and his supervisor wherein they discussed DaVita's relinquishment program as evidencing DaVita's coercive tactics. See Resp. at 14. Mr. Coulombe's characterization of this meeting, without supporting evidence, is insufficient as a matter of law. It is undisputed that the meeting was called to accommodate Mr. Coulombe's schedule. Second Flock Decl. at 7 (Coulombe Dep. at 71) (Dkt. # 63). Mr. Coulombe testified that his supervisor did not pressure him to sign the relinquishment letter at that meeting, or any other time. Flock Decl. at 8-9 (Coulombe Dep. at 79). Rather, the supervisor encouraged Mr. Coulombe to make a decision one way or the other. Id. Finally, Mr. Coulombe did not sign and return the November 22, 2000 Letter until several weeks after this meeting. Id.

ORDER – 9

for partial summary judgment, Mr. Coulombe argues that DaVita violated the terms of Section 050, rendering his agreement to relinquish unenforceable as a matter of law. The court denies Mr. Coulombe's motion because has not demonstrated that DaVita collected a rebate of wages within the meaning of Section 050.

Section 050 is the criminal provision of the anti-kickback statute barring certain labor practices:

> Any employer or officer, vice principal or agent of any employer, whether said employer be in private business or an elected public official, who
>
> (1) Shall collect or receive from any employee a rebate of any part of wages theretofore paid by such employer to such employee; . . .
>
> Shall be guilty of a misdemeanor.

RCW § 49.52.050(1). The Washington Legislature enacted the anti-kickback statute in 1939 "to prevent abuses by employers in a labor-management setting, e.g., coercing rebates from employees in order to circumvent collective bargaining agreements." Ellerman v. Centerpoint Press, Inc., 22 P.3d 795, 798 (Wash. 2001) (citation omitted). The "fundamental purpose of the legislation, as expressed in both the title and body of the act, is to protect the wages of an employee against any diminution or deduction therefrom by rebating, underpayment, or false showing of overpayment of an part of such wages." Id. (citation omitted).

The court concludes that the stock options did not constitute wages within the meaning of the anti-kickback statute. The statute does not define the term "wages," and the court is not aware of any Washington case to consider whether stock options are wages in the context of Section 050. Even so, the general rule that discretionary forms of compensation do not constitute wages is applicable here. In Byrne v. Courtesy Ford, Inc., the Washington Court of Appeals examined whether a TV won by a cars salesman, while on company business, was a wage for purposes of the anti-kickback statute. 32 P.3d 307,

ORDER – 10

310-12 (Wash. Ct. App. 2001). The court held that the TV was not a wage because it was given as a discretionary bonus, reasoning that "a discretionary bonus, unless given consistently and repeatedly is a mere gratuity, not compensation." Id. (citation omitted).

Mr. Coulombe fails to produce evidence that DaVita consistently or repeatedly awarded him stock options. According to DaVita's unanswered evidence, DaVita did not grant Mr. Coulombe any stock options grants during the five year period from 2001-2005. Second Flock Decl. at 8-12 (Coulombe Dep. at 89, 95, 101, 105.). Moreover, there is no evidence to suggest that the stock options formed part of Mr. Coulombe's direct compensation for his labor; rather, the award of such options fell within DaVita's discretion.

The court is further persuaded by an analogous case, IBM v. Bajpek, where the Ninth Circuit, reasoning that stock options are not wages, held that an employer's receipt of profits from a former employee's exercise of stock options was not an illegal rebate under California's anti-kickback statute.[7] 191 F.3d 1033, 1039 (9th Cir. 1999). The court reasoned that the purpose of the statute is to protect employees' reliance interests in their expected wages. Id. By contrast, stock options "do not give rise to a calculable sum of money." Id. "The value of stock awarded in options may be as much affected by the fortuities of stock market behavior as by the profitability of the company," and, unlike wages, their value depends not on an employee's labor but on the "vagaries of stock market valuations on those dates." Id. The same logic is applicable here.

Finally, Section 050's express reference to wages "theretofore paid" weighs against concluding that an illegal rebate occurred under the present circumstances. See

---

[7]Like Section 050, California's anti-kickback statute makes it unlawful for an employer "to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Cal. Lab. Code § 221.

ORDER – 11

RCW § 49.48.050. The contractual rights to purchase stock that DaVita awarded Mr. Coulombe are not equivalent to wages "theretofore paid." This phrase suggests the payment of something of ascertainable value. In November 2000, the exercise price of Mr. Coulombe's stock options far exceeded the shares' value. Moreover, the treatment of stock options as wages "theretofore paid" would present serious practical problems for which the statute provides no clear answer. Given market fluctuations, the value of the stock is indeterminate. Thus, the court concludes that Mr. Coulombe's agreement to relinquish the stock options did not contravene public policy because it was not an illegal rebate under Section 050.

For all of the reasons stated above, the parties rescinded the 1997 and 1998 Agreements. Mr. Coulombe's breach of contract claims fail as a matter of law, and the court grants DaVita's motion for summary judgment

**B.    Mr. Coulombe's Wage Claims Under RCW § 49.48 *et seq*.**

DaVita moves for summary judgment against Mr. Coulombe's claims for unpaid wages. Under RCW § 49.48.010, it is "unlawful for any employer to withhold or divert any portion of an employee's wages." The statute identifies certain exceptions, including where the withholding of wages is "specifically agreed upon orally or in writing by the employee and employer." Id. In turn, RCW § 49.48.030 allows a party to recover attorney's fees "[i]n any action in which any person is successful in recovering judgment for wages or salary owed to him." Mr. Coulombe's claims under RCW § 49.48 *et seq.* rest on his allegation that DaVita failed to pay "all compensation due to him by reason of his employment including unpaid bonuses and salary increases." Compl. ¶ 3.2. The court concludes that Mr. Coulombe's wage claims fail for the following reasons.

First, Mr. Coulombe's claim is premised, in part, on DaVita's refusal to allow him to exercise the stock options. For the reasons set forth above, DaVita's discretionary

ORDER – 12

stock option grants did not constitute wages.[8] Moreover, because Mr. Coulombe expressly rescinded the 1997 and 1998 Agreements, he "specifically agreed" to his relinquishment of stock options, an act that falls squarely within the statute's exception to liability. See RCW § 49.48.010.

Second, Mr. Coulombe's claim is premised on DaVita's failure to pay him certain salary increases and discretionary bonuses. Compl. ¶ 2.5. Notably, Mr. Coulombe does not oppose summary judgment on these claims.[9] In his complaint, Mr. Coulombe alleges that he spoke with his supervisor, Lori Pelliccionni, about an alleged miscalculation of his salary increase in 2004. Id. ¶ 2.21. Mr. Coulombe's own testimony, however, confirms that he received the salary increase that DaVita allegedly owed. Flock Decl. at 11 (Coulombe Dep. at 117) (conceding that he received a 3 percent salary increase in 2003 and a 2 and one-half percent increase in 2004). As to Mr. Coulombe's claim for unpaid bonuses, DaVita produces evidence to show that its awards of bonuses are discretionary, and that DaVita never expressly promised Mr. Coulombe a bonus. Second Lee Decl. ¶¶ 4, 5 (Dkt. # 53); Imbrenda Decl. ¶ 3 (Dkt. # 55). Mr. Coulombe offers no evidence to refute these statements. An employer has no obligation to pay a discretionary bonus absent the existence of a "real promise" to pay additional compensation. Goodpaster v. Pfizer, Inc., 665 P.2d 414, 416 (Wash. Ct. App. 1983). Accordingly, Mr. Coulombe's

---

[8]The court also observes that, unlike the anti-kickback statute, RCW § 49.48.010 expressly defines wages as "compensation due to an employee by reason of employment, payable in legal tender of the United States or checks on banks convertible into cash on demand at full face value. See RCW § 49.48.082(8) (adopting definition of wages in RCW § 49.46.010). Stock options do not qualify as wages "payable in legal tender." Id.

[9]On November 17, 2006, Mr. Coulombe requested leave to amend his complaint to voluntarily dismiss his salary and bonus claims. Mot. to Amend (Dkt. # 41). Mr. Coulombe later withdrew this motion because he had not attached a proposed amended complaint; he stated that he would re-file the motion with a proposed amended complaint. Notice of Withdrawal (Dkt. # 44). To date, Mr. Coulombe has not done so.

ORDER – 13

claims to recover salary increases and discretionary bonuses fail as a matter of law. The court therefore grants DaVita summary judgment on Mr. Coulombe's claims for unpaid wages under RCW § 49.48.010 *et seq*.

**C.      Mr. Coulombe's Quantum Meruit Claim**

Mr. Coulombe also alleges that he is entitled to recover in quantum meruit for the value of his relinquished stock options, unpaid bonuses, and salary increases. Quantum meruit is an equitable doctrine based on the concept that, even absent a specific contract, the law implies a promise to pay a reasonable amount for one's furnishment of labor or materials. See Bailie Comm., Ltd. v. Trend Bus. Sys., Inc., 810 P.2d 12, 18 (Wash. Ct. App. 1991) (citation omitted). Recovery in quantum meruit is limited to the reasonable value of services rendered. Id.

As a threshold matter, a party to a valid contract is bound by the provisions of that contract, and may not disregard the same and bring a quasi-contractual action. See Chandler v. Wash. Toll Bridge Auth.,137 P.2d 97, 103 (Wash. 1943). Here, Mr. Coulombe expressly agreed to relinquish his stock options in the November 22, 2000 Letter. Where such an express agreement to rescind governs the parties' relationship, Mr. Coulombe may not simultaneously pursue a claim for quasi-contractual restitution.

Moreover, as stated above, recovery in quantum meruit is limited to the reasonable value of services rendered. Mr. Coulombe fails to raise a material issue of fact on the question of whether he received reasonable compensation for his labor. There is no dispute that DaVita paid Mr. Coulombe a regular salary. As to salary increases, DaVita's undisputed evidence demonstrates that Mr. Coulombe received annual increases. As to bonuses, DaVita's undisputed evidence shows that these programs were discretionary. The court is further persuaded by the fact that, over the course of his employment, Mr. Coulombe exercised additional stock options for a total profit of $664,934. Flock Decl.

ORDER – 14

at 33 (Westland Decl. ¶ 12). On the record before the court, no reasonable juror could conclude that Mr. Coulombe did not receive reasonable compensation for his work at DaVita.

## IV.  CONCLUSION

For the reasons stated above, the court GRANTS DaVita's motion for summary judgment (Dkt. # 52) and DENIES Mr. Coulombe's motion for partial summary judgment (Dkt. # 57). The court dismisses this action with prejudice, and directs the clerk to enter judgment consistent with this order.

Dated this 4th day of May, 2007.

JAMES L. ROBART
United States District Judge

ORDER – 15